13 P.3d 785

Caroline Saunders KEGGI, Plaintiff–Appellant,

v.

NORTHBROOK PROPERTY AND CASUALTY INSURANCE COMPANY; Transamerica Insurance Company; and TIG Insurance Company, Defendants–Appellees.

No. 1 CA–CV 99–0566.

Court of Appeals of Arizona, Division 1, Department D.

Dec. 5, 2000.

Robbins & Green, P.A. by Philip A. Robbins, Dwayne Ross and John P. Ager, Phoenix, Attorneys for Plaintiff–Appellant.

Teilborg, Sanders & Parks, P.C. by David J. Damron, Phoenix and Luce, Forward, Hamilton & Scripps, LLP by Kathy P. War-ing and Sonia S. Waisman, San Diego, CA, Attorneys for Defendant–Appellee Northbrook.

Lewis and Roca, LLP by Douglas L. Christian, James T. Acuff, Jr. and Bret A. Maidman, Phoenix, Attorneys for Defendant–Appellee TIG.

Copple, Chamberlain, Boehm & Murphy, P.C. by Scott E. Boehm, Phoenix, Attorneys for Amicus Curiae Insurance Environmental Litigation Association.

Whiteman Osterman & Hanna by Jean F. Gerbini, Albany, NY, Attorneys for Amicus Curiae Washington County Fair, Inc.

## OPINION

THOMPSON, Judge.

¶ 1 Caroline Saunders Keggi appeals from the trial court's judgment in favor of Northbrook Property and Casualty Insurance Company (Northbrook) and TIG Insurance Company (TIG). Keggi sought a declaratory judgment that policies issued by the two insurance companies covered Keggi's injuries arising from drinking bacteria-contaminated water served by the insurers' policyholder, Desert Mountain Properties (Desert Mountain). The trial court concluded that the pollution exclusion clauses barred coverage for Keggi's alleged injury. The trial court further concluded that Keggi lacked standing to pursue her claim against TIG. For the following reasons, we reverse the trial court's judgment and remand for further proceedings.

## FACTS

¶ 2 Keggi was a professional golfer who, on occasion, lived and trained at her parents' home in a mixed-use development in north Scottsdale, Arizona, known as Desert Mountain. Desert Mountain included homes, golf courses, and clubhouses. These facilities were served by a water distribution system that originally was owned, operated, and maintained by the Carefree Ranch Water Company, and later was purchased by Desert Mountain.

¶ 3 In late February 1993, the City of Scottsdale detected both total and fecal coli-

form bacteria in the water system at Desert Mountain. The source of the bacteria remains unknown. Before receiving notice of the contamination Keggi became seriously ill. Keggi had consumed contaminated water from the taps at her parents' home and from the Desert Mountain facilities.

¶ 4 Keggi sued Desert Mountain and others for her injuries, asserting claims for negligence, strict liability, and breach of the implied warranties of merchantability and fitness. She alleged that Desert Mountain negligently operated and maintained the water system and that it was strictly liable for serving her contaminated water. She claimed damages for medical expenses, loss of earnings, and loss of earning capacity.

¶ 5 Northbrook provided commercial general liability (CGL) and umbrella insurance coverage for Desert Mountain. TIG provided Desert Mountain's excess liability coverage. Desert Mountain tendered defense of the Keggi lawsuit to Northbrook and TIG, but both insurers denied coverage and refused to defend. Northbrook disclaimed coverage based on the pollution exclusion clause. TIG refused to cover or defend the lawsuit until the limits on the underlying Northbrook policies were exhausted. Desert Mountain filed a declaratory judgment action against Northbrook and TIG, alleging breach of contract and insurance bad faith claims.

¶ 6 In July 1997, Desert Mountain and Keggi entered into a *Damron* agreement. Desert Mountain stipulated to a $1.2 million dollar judgment against it and assigned its rights against Northbrook to Keggi. Keggi agreed not to execute the judgment against Desert Mountain. Keggi was granted leave to intervene in the lawsuit filed by Desert Mountain against Northbrook and TIG.

¶ 7 After cross motions for summary judgment, the trial court granted summary judgment to Northbrook and TIG, ruling that the pollution exclusion clauses in each of the insurance policies precluded coverage for Keggi's claims. The trial court also ruled that Keggi lacked standing to bring her claims against TIG because she had failed to obtain an assignment of Desert Mountain's claims against TIG. We have jurisdiction pursuant to Arizona Revised Statutes Annotated (A.R.S.) § 12–2101(B).

¶ 8 We granted leave for the Insurance Environmental Litigation Association and Washington County Fair, Inc. to file *amicus curiae* briefs.

## DISCUSSION

### A. Standing

¶ 9 TIG contends that Keggi lacks standing to pursue the claims against it because she did not obtain an assignment of Desert Mountain's claims against TIG. Keggi contends that she was a proper party to the declaratory judgment action against TIG pursuant to the uniform declaratory judgments act. *See* A.R.S. §§ 12–1831 to –1846 (1994). The declaratory judgments act provides:

Any person interested under a ... written contract, ... or whose rights, status or other legal relations are affected by a ... contract ... may have determined any question of construction or validity arising under the instrument ... [or] contract, ... and obtain a declaration of rights, status or other legal relations thereunder.

A.R.S. § 12–1832.

¶ 10 The declaratory judgments act is interpreted liberally. *See, e.g., Planned Parenthood Center of Tucson, Inc. v. Marks,* 17 Ariz.App. 308, 310, 497 P.2d 534, 536 (1972). Under the declaratory judgments act a justiciable controversy exists if there is "an assertion of a right, status, or legal relation in which the plaintiff has a definite interest and a denial of it by the opposing party." *Samaritan Health Services v. City of Glendale,* 148 Ariz. 394, 395, 714 P.2d 887, 888 (App.1986)(citing *Morris v. Fleming,* 128 Ariz. 271, 625 P.2d 334 (App.1981)). In this case, Keggi asserts a right to payment of her judgment against Desert Mountain under TIG's policy and TIG denies that the policy applies. This dispute is sufficient to create a justiciable controversy for the purposes of the declaratory judgments act. The trial court therefore erred in concluding that Keg-

gi lacked standing to assert her claims against TIG.[1]

## B. Northbrook's Pollution Exclusion Clause

¶ 11 Interpretation of an insurance contract is a question of law which we review *de novo. Benevides v. Arizona Prop. & Cas. Ins. Guar. Fund,* 184 Ariz. 610, 613, 911 P.2d 616, 619 (App.1995). We construe provisions in insurance contracts according to their plain and ordinary meaning. *Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). "[A]mbiguity in an insurance policy will be construed against the insurer"; however, this rule applies only to provisions that are "actually ambiguous." *Thomas v. Liberty Mut. Ins. Co.,* 173 Ariz. 322, 325, 842 P.2d 1335, 1338 (App.1992). If a clause may be susceptible to different constructions, rather than simply finding ambiguity and resorting to the *contra proferentem* doctrine, we will first attempt to discern the meaning of the clause "by examining the purpose of the exclusion in question, the public policy considerations involved and the transaction as a whole." *Ohio Cas. Ins. Co. v. Henderson,* 189 Ariz. 184, 186, 939 P.2d 1337, 1339 (1997) (quoting *Transamerica Ins. Group v. Meere,* 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984)).

¶ 12 Northbrook provided both CGL and umbrella insurance coverage for Desert Mountain. The primary CGL policy was effective from February 28, 1992 to February 28, 1994, and the umbrella policy was effective from February 28, 1992 to February 28, 1993. The primary policy was a standard form and provided coverage for "bodily injury ... caused by an occurrence that takes place in the coverage territory ... during the policy period." The policy defined "Bodily injury" as "bodily injury, sickness or disease sustained by a person, including death

resulting from any of these at any time." The excess policy covers losses in excess of the primary policy limits "for losses covered under the terms of such underlying insurance." The policies contained identical pollution exclusion clauses.

¶ 13 Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion. *Pacific Indem. Co. v. Kohlhase,* 9 Ariz.App. 595, 597, 455 P.2d 277, 279 (1969). In this case, Northbrook does not argue that Keggi's injuries were not covered; rather, Northbrook argues that the total and fecal coliform bacteria that contaminated the water and caused Keggi's illness were excluded "pollutants" within the meaning of the pollution exclusion clauses. *Cf. United States Fidelity & Guar. Corp. v. Advance Roofing & Supply Co.,* 163 Ariz. 476, 483, 788 P.2d 1227, 1234 (App.1989) ("policy exclusions ... merely subtract from coverage already granted"). Thus, Northbrook had the burden of establishing the exclusion.

¶ 14 Both Northbrook policies include standard pollution exclusion clauses, which are identical except for the numbering of the paragraphs, and provide as follows:

This insurance does not apply to:

(1) *Bodily injury* or property damage *arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:*

  (a) *At or from any premises, site or location which is or was at any time owned or occupied by,* or rented or loaned to, *any Insured;*

  (b) At or from any premises, site or location which is or was at any time used by or for any Insured or others

---

1. Keggi also argues that Arizona law allows a plaintiff to satisfy a judgment against an insured defendant by proceeding against the defendant's insurer, citing *Sandoval v. Chenoweth,* 102 Ariz. 241, 428 P.2d 98 (1967) and *Falcon v. Beverly Hills Mortgage Corp.,* 166 Ariz. 311, 802 P.2d 1010 (App.1990). Although we need not address this argument, in light of our conclusion that Keggi has standing to pursue her claim under the declaratory judgments act, we note that *Sandoval*

and *Falcon* involved garnishment proceedings, not a declaratory judgment or breach of contract action by a plaintiff against the defendant's insurer. These cases do not support Keggi's argument that she may sue TIG, to collect on her judgment against Desert Mountain, without following the garnishment procedures and without obtaining an assignment of Desert Mountain's rights against TIG.

for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any Insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any Insured or any contractors or subcontractors working directly or indirectly on any Insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such Insured, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to bodily injury or property damage arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants.

*Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.*

Although our analysis of the pollution exclusion focuses on the emphasized language, we have set forth the entire exclusion to provide the context for our discussion of its meaning.

¶ 15 We begin with the plain language of the policy definition of "pollutants." Courts across the country have noted the breadth of the terms "irritant" and "contaminant." *See, e.g., Nautilus Ins. Co. v. Jabar,* 188 F.3d 27 (1st Cir.1999) ("the terms 'irritant' and 'contaminant' are virtually boundless, for 'there is no substance or chemical in existence that would not irritate or damage some person or property.'") (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir.1992) and *Westchester Fire Ins. Co. v. City of Pittsburg,* 768 F.Supp. 1463, 1470 (D.Kan.1991)); *Regional Bank of Colorado, N.A. v. St. Paul Fire and Marine Ins. Co.,* 35 F.3d 494, 498 (10th Cir. 1994); *American States Ins. Co. v. Kiger,* 662 N.E.2d 945, 948 (Ind.1996) ("Clearly, this clause cannot be read literally as it would negate virtually all coverage."); *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 667 A.2d 617, 621 (1995).

¶ 16 While the terms "irritant" and "contaminant" may be extraordinarily broad, we note that the Northbrook policies limit "pollutants" to "irritants" and "contaminants" that are "solid, liquid, gaseous or thermal." The water-borne bacteria alleged to have caused Keggi's injury do not fit neatly within this definition. To the extent that bacteria might be considered "irritants" or "contaminants" they are *living, organic* irritants or contaminants which defy description under the policy as "solid," "liquid," "gaseous," or "thermal" pollutants.

¶ 17 We further note that the exclusion delineates the types of contaminants or irritants included within the definition of "pollutants": "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Because use of the term "including" in a definition generally indicates that unlisted items may nevertheless fall within the definition, we conclude that the list is non-exhaustive. However, under the rule of *ejusdem generis,* any unlisted items that are construed to fall within

the definition must be similar in nature to the listed items. *See generally United California Bank v. Prudential Ins. Co. of America,* 140 Ariz. 238, 273, 681 P.2d 390, 425 (App.1983) ("[W]here general words in a contract are followed by enumerated specific terms involving the same subject matter . . . the meaning of the general terms is presumed . . . to include only those things of the same nature as those specifically enumerated"). The enumerated items, namely "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste" are primarily inorganic in nature. Bacteria, as living organisms, are not similar to the exclusion's enumerated list.

¶ 18 Finally, we turn to the term "waste," which arguably could include organic waste material which is a potential source of fecal coliform bacteria. "Waste" is defined under the policies to include "materials to be recycled, reconditioned or reclaimed." This definition of "waste" implies that the term refers to industrial byproducts, rather than to the organic matter which might have caused the contamination of the water with total and fecal coliform bacteria.

¶ 19 We conclude that the plain language of the pollution exclusion does not include total and fecal coliform bacteria within the definition of "pollutants." Thus, the exclusion does not apply to preclude coverage for Keggi's injuries.

¶ 20 Northbrook, however, contends that the term "pollutants" includes "any . . . contaminant" (unmodified by the terms "liquid, solid, gaseous or thermal"), that Keggi concedes that the bacteria in this case "contaminated" the water, and that the bacteria must therefore be a "contaminant" and, by definition, a pollutant. Assuming without deciding that the clause reasonably could be interpreted this way, such an interpretation at best would render the clause ambiguous, because the clause would be susceptible to two reasonable interpretations.

¶ 21 The parties did not submit any evidence regarding the purpose of the pollution exclusion, and our courts have not previously considered this question. We note that the clause appears to be identical to the standard "absolute" pollution exclusion clause adopted by the insurance industry. *See, e.g., Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34, 36 (2nd Cir.1995); *Sullins,* 667 A.2d at 622. Many courts that have considered the purpose of the standard absolute pollution exclusion clause have concluded that the clause is intended to preclude coverage for environmental pollution, not for "all contact with substances that can be classified as pollutants." *Stoney Run,* 47 F.3d at 38; *see also Island Associates, Inc. v. ERIC Group, Inc.,* 894 F.Supp. 200, 203 (W.D.Pa. 1995) ("an insurer that wishes to exclude 'everyday activities gone slightly awry' from coverage cannot rely on a broad reading of a pollution exclusion clause"); *Thompson v. Temple,* 580 So.2d 1133, 1134 (La.App.1991) ("Pollution exclusion clauses are intended to exclude coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time").

¶ 22 In support of this interpretation, courts have noted that

the terms used in the pollution exclusion, such as "discharge," "dispersal," "release," and "escape," are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste.

*Sullins,* 667 A.2d at 620–21(quoting *Atlantic Mut. Ins. v. McFadden,* 413 Mass. 90, 595 N.E.2d 762, 764 (1992)); *see also Nautilus,* 188 F.3d at 30. We also note that the exclusion clause appears to describe events, places, and activities normally associated with traditional environmental pollution claims. For example, the clause precludes coverage for dispersal, etc., of "pollutants" at or from sites "used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste," as well as for pollutants that "are or were at any time transported, handled, stored, treated, disposed of, or processed as waste." These provisions appear to be directed at industrial insureds who must handle, store, and treat "hazardous wastes" in conducting their daily operations. Similarly, the clause precludes coverage for any "loss, cost or expense arising out of" a "[r]equest, demand or order [presumably from a government entity] that any Insured or others test for, monitor, clean

up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants"; and for claims or suits "by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants." These provisions appear to be intended to preclude coverage for clean-up operations ordered under RCRA, CERCLA, and other federal or state environmental laws. Thus, the exclusion's context confirms that the drafters intended it to apply to traditional "environmental pollution" situations and substances.

¶ 23 Historically, the pollution exclusion clauses arose in CGL policies in the 1970's, in response to "the insurance industry's increased concern about pollution claims [attributable to] environmental catastrophes that occurred during the 1960s." *Sullins*, 667 A.2d at 622 (quoting *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831, 850 (1993)). For all of these reasons, courts generally have concluded that the exclusion was intended to eliminate coverage for damages "traditionally associated with environmental pollution." *Nautilus*, 188 F.3d at 31; *see also Sullins*, 667 A.2d at 622; *Continental Cas. Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 512 (1993); *Thompson*, 580 So.2d at 1134; *Molton, Allen & Williams v. St. Paul Fire & Marine Ins.*, 347 So.2d 95, 99 (Ala.1977). We agree with the reasoning of these courts, and conclude that the pollution exclusion clause was intended to exclude coverage for causes of action arising from traditional environmental pollution.

¶ 24 Moreover, we find the cases cited by Northbrook distinguishable. For example, the court in *City of Salina, Kansas v. Maryland Cas. Co.*, 856 F.Supp. 1467 (D.Kan. 1994), held that the pollution exclusion precluded coverage for damage from wastewater from the city sewer which backed up into a residence. It did so, however, based on the undisputed fact that the wastewater was extremely alkaline, and therefore was a "pollutant" within the express terms of the exclusion (which listed "alkalis" as a specific type of "irritant or contaminant"). Moreover, the

initial contamination of the wastewater in the *City of Salina* case resulted from an event which would traditionally be considered "environmental pollution": a pipe flowing from a tank containing a concentrated sodium hydroxide solution burst, spilling the solution into the sewer system.

¶ 25 *Royal Insurance Co. v. Bithell*, cited by the insurance companies is, likewise, not helpful. *See* 868 F.Supp. 878 (E.D.Mich. 1993). First, at issue in *Royal* is a homeowners policy, not a standard CGL policy specifically written to cover water distribution activities. Next, the contamination of the home in *Royal* resulted from a known source, namely a nearby broken sewer pipe. Finally, the *Royal* court's summary conclusion that "raw sewage is clearly a contaminant" does not persuade us that waterborne-bacteria is a pollutant as that term is defined under the Northbrook CGL policy.

¶ 26 In this case, the cause of the water's contamination with bacteria was unknown. The City of Scottsdale's representative, in an affidavit, stated that there were many possible causes, including contamination due to flooding and the resulting transmittal of bacteria, from unknown sources, into the ground water or into unknown openings in the water distribution system. Because contamination could have resulted from causes unrelated to traditional environmental pollution, and Northbrook presented no evidence to support a finding that the contamination actually resulted from environmental pollution, Northbrook has failed to carry its burden to show that the exclusion was intended to apply to the facts presented in this case.

¶ 27 Additionally, public policy supports an interpretation limiting the clause to its initial, intended purpose of excluding coverage for traditional environmental pollution-related claims. As a number of courts have noted,

The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and

lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Pipefitters,* 976 F.2d at 1043 (citations omitted); *see also Regional Bank of Colorado,* 35 F.3d at 498. Public policy supports a narrow interpretation of the exclusion so that it does not eviscerate coverage otherwise reasonably expected by the insured.

¶ 28 Northbrook contends that public policy supports enforcing insurance policy provisions as written. In this case, Northbrook contends, doing so would preclude coverage. Courts may not rewrite insurance policies to "avoid possible harsh results." *State Farm Mut. Auto. Ins. Co. v. O'Brien,* 24 Ariz.App. 18, 20, 535 P.2d 46, 48 (1975). Northbrook's admonition to "enforce the language of the policy as written," however, does not assist us in determining what the policy language, as written, actually means. In attempting to discern the meaning of an actually ambiguous clause, we are not "disregarding" the policy's provisions, but enforcing them.

¶ 29 Finally, the transaction as a whole supports a finding that the exclusion does not apply in this case. Desert Mountain's CGL premium specifically contemplated the operation of golf clubs and restaurants, and even the provision of water through its water company. Certainly an insured who purchases CGL insurance expects to be covered for ordinary negligence in the course of its insured operations. Where the insured's operations include distribution or serving of water, an insured would reasonably expect to be covered for negligently distributing or serving contaminated water which causes an illness or disease. *See Covington Township v. Pacific Employers Ins. Co.,* 639 F.Supp. 793 (M.D.Pa.1986) (holding insurer must defend municipal policyholder in actions alleging injuries caused by presence of giardia cysts in water supply, based on municipality's acts or omissions in water monitoring). This reasonable expectation is bolstered by the policy's coverage for "bodily injury," expressly defined to include "sickness or disease," since "sickness or disease" is an expected result of the consumption of contaminated water. *Cf. Millar v. State Farm Fire & Cas. Co.,* 167 Ariz. 93, 96, 804 P.2d 822, 825 (App.1990) (citing 2 G. Couch, *Cyclopedia of Insurance Law,* § 15.29 (rev. ed.1984) for proposition that "all provisions of policy must be interpreted together as one contract"). The transaction as a whole indicates an intent to provide coverage for "sickness or disease" caused by contaminated water served or distributed by Desert Mountain. We decline to interpret the term "pollutants" so broadly as to include "bacteria," and thereby to negate coverage in this case, especially where there was no evidence that the contamination of the water with the bacteria was caused by traditional environmental pollution.

¶ 30 We conclude that the pollution exclusion clause at issue, by its plain language, does not include "bacteria." Alternatively, even if the language could be interpreted broadly enough to include "bacteria," we conclude that the purpose of the clause, public policy, and the transaction as a whole, demonstrate that the language nevertheless should not be interpreted to preclude coverage for bacterial contamination absent any evidence that the actual contamination arose from traditional environmental pollution. Accordingly, the trial court erred in granting summary judgment in favor of Northbrook based on the pollution exclusion.

## C. TIG's Pollution Exclusion Clause

¶ 31 As noted above, TIG provided an excess insurance policy for Desert Mountain. TIG's policy was designed to cover the same types of liabilities as the underlying Northbrook policy. TIG joined in Northbrook's arguments on appeal, stating that, for the reasons set forth in Northbrook's brief, TIG's policies excluded coverage for Keggi's injuries. TIG additionally asserts that "The absolute pollution exclusions in both TIG policies, which are broader than

those in Northbrook's policies, unambiguously bar such claims." [2]

¶ 32 The TIG pollution exclusion provides in relevant part:

This insurance does not apply to:

A. Bodily injury, property damage, personal injury arising out of:

1. The actual alleged or threatened discharge, dispersal, release or escape of pollutants[.]

The TIG policy defines "pollutants" as "any noise, solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot fumes, acids, alkalies, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

¶ 33 We conclude that TIG's pollution exclusion does not differ in any material respect from Northbrook's pollution exclusion, at least as applied to this case. For the reasons stated above, we conclude that the exclusion does not preclude coverage for Keggi's injuries arising from the bacterial contamination of water provided by Desert Mountain. The trial court erred in granting summary judgment to TIG based on the pollution exclusion clause. Keggi is entitled to judgment.

### D. Requests for Attorneys' Fees

¶ 34 TIG and Northbrook request attorneys' fees pursuant to A.R.S. §§ 12–341.01(C) and 12–349. Having ruled in favor of Keggi, we decline to find that her appeal was meritless or brought merely for the purpose of delay or harassment, and therefore deny the fee requests.

¶ 35 Keggi requests an award of costs and attorneys' fees pursuant to A.R.S. § 12–341.01(A), which allows this court to award fees to the successful party in an action arising out of contract. As the prevailing party, Keggi is entitled to an award of costs. In our discretion, we award her reasonable attorneys' fees.

### CONCLUSION

¶ 36 For the foregoing reasons, we reverse the trial court's judgment in favor of Northbrook and TIG, and remand for further proceedings consistent with this decision. We deny Northbrook's and TIG's requests for costs and attorneys' fees, and grant Keggi's request for costs and reasonable attorneys' fees.

CONCURRING: SHELDON H. WEISBERG, Presiding Judge, and CECIL B. PATTERSON, JR., Judge.

---

2. We note that TIG has not supported this claim (that its exclusion is broader than Northbrook's) with any argument or citation to authority, and we therefore could consider the argument waived. *See Schabel v. Deer Valley Unified School Dist. No. 97*, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996) (issues not clearly raised and argued in party's appellate brief are waived); *Ness v. Western Sec. Life Ins. Co.*, 174 Ariz. 497, 503, 851 P.2d 122, 128 (App.1992)(arguments unsupported by any authority will not be considered on appeal). Nonetheless, we will consider TIG's argument.