269 P.3d 693

**COLORADO CASUALTY INSURANCE COMPANY, a Colorado corporation, Plaintiff/Appellee,**

**v.**

**SAFETY CONTROL COMPANY, INC., an Arizona corporation; Employer's Mutual Casualty Company, an insurance company, Defendant/Appellant,**

**Hugo Roman, an individual, Intervenor/Appellee.**

**No. 1 CA–CV 10–0871.**

Court of Appeals of Arizona, Division 1, Department E.

Jan. 5, 2012.

520

Raymond Greer & Sassaman PC By Daniel W. McCarthy, Michael J. Raymond, Phoenix, Attorneys for Defendant/Appellant Safety Control Co., Inc.

Stinson Brown By William G. Stinson, Jr., Glendale, and William H. Douglas, PLLC By William H. Douglas, Scottsdale, Attorneys for Defendant/Appellant Employer's Mutual Casualty Co.

The Rees Law Firm By David W. Rees, Tucson, Attorneys for Plaintiff/Appellee.

Fennemore Craig PC By Julio M. Zapata, John D. Everroad, Alexander R. Arpad, Phoenix, Attorneys for Intervenor/Appellee.

**OPINION**

JOHNSEN, Judge.

¶ 1 We address in this case the validity and effect of a *Damron* agreement a contractor and its excess insurer entered into that assigned their rights to sue the primary insurer.[1] We hold the agreement is enforceable but remand for a determination of whether the stipulated judgment falls within the primary insurer's policy.

---

**1.** A *"Damron"* agreement is an agreement between a claimant and an insured in which the insured consents to a judgment and agrees to assign to the claimant the insured's claims against its insurer in exchange for the claimant's covenant not to execute on the stipulated judgment. *See Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969); *see also United Servs. Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987).

## FACTS AND PROCEDURAL HISTORY

¶ 2 The Arizona Department of Transportation ("ADOT") hired DBA Construction Company ("DBA") to perform a road-improvement project on the Loop 101 freeway. Safety Control Company, Inc. was one of DBA's subcontractors. As required by the subcontract, Safety Control purchased from Employer's Mutual Casualty Company ("EMC") a certificate of insurance identifying DBA as an additional insured on a policy providing primary coverage for liability arising out of Safety Control's work. DBA itself had purchased a policy from Colorado Casualty Insurance Company that provided excess coverage for liability arising out of the work of its subcontractors, including Safety Control.

¶ 3 A collision occurred at the construction site, injuring a motorist, Hugo Roman, who sued ADOT and DBA for damages. Colorado Casualty tendered DBA's defense to the subcontractors, including Safety Control. Safety Control and EMC rejected the tender. Roman eventually settled his claims against DBA and ADOT. DBA and ADOT stipulated with Roman for entry of judgment of $750,000; Roman received $75,000 from DBA (paid by Colorado Casualty) and $20,000 from ADOT, and agreed not to execute on the stipulated judgment. Finally, DBA, ADOT and Colorado Casualty assigned to Roman their rights against the subcontractors and other insurers.

¶ 4 Colorado Casualty then filed suit against three subcontractors and their insurance carriers—including Safety Control and EMC—to recover what it had paid to defend DBA and ADOT and settle with Roman. Roman in turn moved to intervene and dismiss, arguing Colorado Casualty had assigned its subrogation rights to him as part of the settlement agreement. The superior court did not dismiss the suit, but allowed Roman to intervene. Roman then filed a counterclaim against Colorado Casualty and a cross-claim against the subcontractors.

¶ 5 Roman and Colorado Casualty eventually settled their claims against all of the defendants and cross-defendants except Safety Control and EMC. The superior court ruled on summary judgment that EMC

breached a duty to defend DBA and that as a result, "DBA was entitled to settle with Roman without EMC's consent as long as the settlement was not collusive or fraudulent." After more briefing, the court held the stipulated judgment was neither collusive nor procured by fraud and that EMC therefore was liable to Roman on the stipulated judgment and for his attorney's fees. The court also held Safety Control breached its subcontract with DBA by failing to procure completed-operations insurance coverage and would be liable for damages to the extent that EMC did not satisfy what remained (after the other settlements) of the stipulated judgment and awards of attorney's fees.

¶ 6 Safety Control and EMC timely appealed from the judgment. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") section 12–2101(A)(1) (2011).

## DISCUSSION

### A. Standard of Review.

¶ 7 On review of summary judgment, we view all facts and inferences in the light most favorable to the parties against which judgment was entered. *Case Corp. v. Gehrke*, 208 Ariz. 140, 143, ¶ 10, 91 P.3d 362, 365 (App.2004). "Interpretation of a contract is a question of law that we review *de novo.*" *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86, ¶ 12, 138 P.3d 1210, 1213 (App.2006).

### B. The Disagreement Between Roman and Colorado Casualty Does Not Preclude Them from Pursuing Their Claims Against EMC and Safety Control.

¶ 8 We first address the contention by Safety Control and EMC that the judgment against them is unenforceable because a dispute remains between Roman and Colorado Casualty about which of them owns some of the claims at issue.

¶ 9 The record discloses that the initial version of a settlement agreement among Roman, DBA, ADOT and Colorado Casualty

reserved Colorado Casualty's right to pursue claims against Safety Control and/or EMC for fees and costs it incurred in defending DBA and ADOT against Roman's complaint. But the final version of the settlement agreement omitted any mention of any such subrogation rights. Colorado Casualty's complaint and Roman's complaint-in-intervention reflect a disagreement about which of them has the right to pursue the claims for fees and costs.

¶ 10 The superior court's judgment includes $97,011.03 awarded to Colorado Casualty, which we understand to be on its claims for reimbursement of defense fees and costs. As to that amount, however, the judgment provides, "Roman and Colorado Casualty shall resolve their dispute concerning this award amongst themselves." Consistent with that statement, in the summary judgment proceedings in the superior court and on appeal, Roman and Colorado Casualty assert that they have agreed to pursue the assigned claims jointly and to resolve the question of which of them is entitled to the proceeds after the matter is resolved on the merits.

¶ 11 Safety Control and EMC cite Arizona Rule of Civil Procedure 17(a) to support their argument that the superior court should have determined which party owns the claims for fees and costs before entering judgment. That rule states, "Every action shall be prosecuted in the name of the real party in interest." The purpose of this rule "is to enable the defendant to avail himself of the evidence and defenses that he has against the real party in interest and to assure the finality of the results in the application of res judicata." *Cruz v. Lusk Collection Agency,* 119 Ariz. 356, 358, 580 P.2d 1210, 1212 (App.1978).

¶ 12 Under these circumstances, we conclude Rule 17(a) does not preclude the judgment the superior court entered on the claims for recovery of defense fees and costs. Safety Control and EMC do not argue that the agreement between Roman and Colorado

Casualty has prevented them from raising any defenses to the claims or that the judgment might allow a double recovery. The judgment only awarded the fees and costs to Colorado Casualty, not to Roman or to both of them, and we fail to see how Safety Control and EMC are prejudiced by the judgment or the agreement between Roman and Colorado Casualty that the judgment anticipates.

## C. The Settlement Agreement Is Not Otherwise Invalid.

¶ 13 An insurance contract imposes on the insurer the duty to defend the insured against claims potentially covered by the policy and the duty to indemnify the insured for covered claims. *United Servs. Auto. Ass'n v. Morris,* 154 Ariz. 113, 117, 741 P.2d 246, 250 (1987); *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme,* 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987). The insured, in turn, must cooperate with the insurer and aid in his defense. *See Helme,* 153 Ariz. at 136, 735 P.2d at 458; *see also Morris,* 154 Ariz. at 117, 741 P.2d at 250.

¶ 14 In *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969), our supreme court held that when an insurer breaches the contract of insurance by failing to defend, the duty of cooperation does not prevent the insured from entering into a settlement with the claimant and assigning his rights under the policy to the claimant. *Id.* at 153, 460 P.2d at 999; *see Morris,* 154 Ariz. at 119, 741 P.2d at 252 (insured may enter similar agreement if insurer defends but reserves its right to dispute coverage). As long as the stipulated judgment is not fraudulent or collusive, an insurer that has failed to defend is bound by the judgment "with respect to all matters which were litigated or could have been litigated in that action." *State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 200, 593 P.2d 948, 950 (App.1979).[2]

¶ 15 EMC argues DBA's settlement with Roman was collusive because, unlike the

---

2. An exception applies to an adjudication involving an issue as to which there is a conflict of interest between the insured and the insurer; in that case, even if the insurer refused to defend, it

is not bound by the adjudication. *Farmers Ins. Co. of Ariz. v. Vagnozzi,* 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983) (citing Restatement (Second) of Judgments § 58 (1982)).

insured in a typical *Damron* situation whose insurer has refused to defend, DBA was not compelled to settle to avoid "the sharp thrust of personal liability." *See Damron*, 105 Ariz. at 153, 460 P.2d at 999. Given that Colorado Casualty was providing DBA with a defense, EMC argues the impermissible purpose of the agreement was not to protect DBA but to shift liability for the settlement amount from Colorado Casualty to EMC.

¶ 16 In support of its contention that an insured may enter into a *Damron* agreement only when necessary to shield himself from personal liability, EMC cites *Leflet v. Redwood Fire & Casualty Insurance Co.*, 226 Ariz. 297, 247 P.3d 180 (App.2011). *Leflet* arose out of construction defect claims brought by homeowners against a developer. *Id.* at 298, ¶ 1, 247 P.3d at 181. The developer tendered its defense to its subcontractors' insurers, which accepted the tender but reserved their rights to contest coverage. *Id.* at 299, ¶ 5, 247 P.3d at 182. Ultimately the developer and two of its own insurers settled with the homeowners, stipulated to a judgment and assigned to the homeowners their rights against the subcontractors and their insurers in exchange for a covenant not to execute on the judgment. *Id.* at ¶ 7. The subcontractors' insurers objected, claiming that the agreement was not a valid *Morris* agreement and constituted a breach of the cooperation clause. *Id.* at 300, ¶ 10, 247 P.3d at 183. On appeal, we held the agreement invalid because it favored the developer's insurer, which provided primary coverage, over the subcontractors' insurers, whose coverage presumably was excess. *Id.* at 298–99, ¶ 2, 247 P.3d at 181–82.

¶ 17 The court in *Leflet* did not address the issue presented here, which is a primary insurer's refusal to defend a claim that arguably is within its policy. In our case, the coverage provided by Colorado Casualty was *excess* to the primary coverage furnished by EMC for claims arising out of Safety Control's work.[3] Therefore, to the extent that the stipulated judgment represented damages covered by the EMC policy, an issue we

address below, the settlement only put the liability where it should be in the first instance—with the primary insurer rather than with the excess insurer. As the primary insurer, EMC was liable for covered claims up to its policy limit, which exceeded the amount of the stipulated judgment. Therefore, the settlement did not fraudulently or collusively shift liability from Colorado Casualty to EMC.

¶ 18 Contrary to EMC's contention, DBA's settlement with Roman is not invalid simply because DBA was enjoying the benefit of a defense provided by Colorado Casualty after EMC declined. As we held in *Paynter*, an insurer that refuses to defend a claim must know that a judgment may be entered against the insured and that it will be liable if the claim is within its policy. 122 Ariz. at 201, 593 P.2d at 951. EMC may not escape the consequences of its decision to decline to defend DBA in this case simply because DBA's excess insurer did not make the same decision.

## D. Issues of Fact Remain About Whether the Judgment Falls Within the EMC Policy.

### 1. Legal principles.

¶ 19 The insured in a *Damron* agreement typically assigns to the claimant all his claims against the insurer, including claims for breach of contract and breach of the covenant of good faith and fair dealing. In this case, however, Roman's cross-claim against EMC only sought to enforce DBA's rights to a defense and indemnification under the EMC policy; Roman did not allege any claim for bad-faith liability.

¶ 20 Colorado Casualty and DBA argued in the superior court that because the settlement was not fraudulent or collusive, EMC was liable for the amount of the stipulated judgment as a matter of law. But an agreement under *Damron* or *Morris* does not create coverage "that the insured did not purchase." *Morris*, 154 Ariz. at 120, 741

---

**3.** Safety Control's subcontract required it to procure primary coverage for DBA for liability arising out of Safety Control's ongoing operations for DBA. Although on appeal EMC did not concede its policy provided primary coverage of DBA for such liability, at no point in this litigation has it argued its coverage is anything other than primary.

P.2d at 253. To the contrary, EMC is liable only if the judgment constituted a liability falling within its policy. *Id.; see Paynter,* 122 Ariz. at 200, 593 P.2d at 950.

### 2. Whether the judgment is a liability that "arises out of" Safety Control's operations.

¶ 21 The EMC policy insured DBA "with respect to liability arising out of [Safety Control's] ongoing operations performed" pursuant to the subcontract. "[A]rising out of" is a "broad, general, and comprehensive term[ ] effecting broad coverage." *Regal Homes, Inc. v. CNA Ins.,* 217 Ariz. 159, 163, ¶ 15, 171 P.3d 610, 614 (App. 2007) (citing *Farmers Ins. Co. v. Till,* 170 Ariz. 429, 430, 825 P.2d 954, 955 (App.1992)). For claimed damages to "arise out of" an occurrence, there must be evidence of a "causal relationship" between the two events, but proximate causation is not required. *Farmers,* 170 Ariz. at 430, 825 P.2d at 955.

¶ 22 In considering whether the stipulated judgment was a liability "arising out of" Safety Control's work, we first determine whether the judgment has any preclusive effects bearing on coverage. Under general principles of indemnity law, if an indemnitor has received "reasonable notice of the action" but declines an opportunity to assume or participate in the defense, absent a conflict of interest it is "estopped from disputing the existence and extent of the indemnitee's liability" if the "indemnitee defended the action with due diligence and reasonable prudence." Restatement (Second) of Judgments ("Restatement") § 57(1) (1982). The result is that the "indemnitor is precluded from relitigating issues determined" in the judgment. *Cunningham v. Goettl Air Conditioning, Inc.,* 194 Ariz. 236, 240, ¶ 19, 980 P.2d 489, 493 (1999) (quoting Restatement § 57(1)). *See also A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County,* 220 Ariz. 202, 208, ¶ 15, 204 P.3d 1051, 1057 (App.2008) (applying Restatement § 57(1) in commercial indemnity case; "[w]e discern no fundamental difference between the obligations imposed under § 57(1) and those set forth in the *Damron/Morris* line of cases").

¶ 23 There is no dispute that EMC received notice and an opportunity to participate in the case Roman brought against DBA. Nor does EMC raise any real argument that DBA did not defend itself diligently and prudently in that case. Accordingly, EMC is bound for purposes of coverage by any issues determined by the stipulated judgment. *See Associated Aviation Underwriters v. Wood,* 209 Ariz. 137, 150, ¶ 37, 98 P.3d 572, 585 (App.2004) (insurer bound by "legal and factual issues that underlie" stipulated judgment entered pursuant to *Morris* ). Having inspected the stipulated judgment and reviewed the circumstances under which it was entered, however, we cannot conclude that the judgment necessarily decided any significant issues bearing on coverage under the EMC policy.

¶ 24 Roman's complaint had alleged DBA and ADOT were negligent in configuring, installing and maintaining various devices, including pavement markings, temporary traffic barricades and concrete barriers, used to control traffic during the freeway construction project. DBA contracted with Safety Control for the concrete barriers used to help divert traffic around the construction site; other subcontractors were responsible for other traffic control devices, all of which were installed pursuant to a plan that Safety Control alleges was not within its scope of work. Against this scenario, the judgment to which ADOT and DBA stipulated did not specify how the collision occurred or the manner in which any of its subcontractors was negligent in causing Roman's injuries. Indeed, the judgment incorporated by reference the parties' settlement agreement, which expressly provided that neither DBA nor ADOT admitted "liability for any of the claims that have been asserted against them."

¶ 25 In determining the scope of an insurer's duty to defend, whether a claim "arose out of" a party's work "must be determined initially from the allegations in the complaint against [the party] and the facts known at that time." *Regal Homes,* 217 Ariz. at 164, ¶ 19, 171 P.3d at 615. But we deal here with an insurer's duty to indemnify, not with its duty to defend. An insurer's

duty to indemnify hinges not on the facts the claimant alleges and hopes to prove but instead on the facts (proven, stipulated or otherwise established) that actually create the insured's liability. *See Salerno v. Atlantic Mut. Ins. Co.*, 198 Ariz. 54, 58–59, ¶ 17, 6 P.3d 758, 762–63 (App.2000) (court of appeals looked beyond allegations in complaint in determining coverage).

¶ 26 The record contains no finding by the superior court that DBA's liability to Roman arose out of Safety Control's work, within the meaning of the EMC policy; nor does it appear the parties asked the court to address that issue. Therefore, on remand, the court shall conduct whatever proceedings it deems appropriate to resolve that issue.

### 3. Safety Control's "ongoing operations."

¶ 27 EMC urges us to reverse two rulings the superior court made on summary judgment that on remand will bear on whether the stipulated judgment falls within the policy. First, as stated, the policy insured DBA for liability arising out of Safety Control's "ongoing operations" for DBA. The superior court held Safety Control's operations were ongoing at the time of the collision; on appeal, EMC argues there is no coverage under its policy because Safety Control's "ongoing operations" were completed at the time of the collision.

■ ¶ 28 The policy does not define "ongoing operations," and no Arizona court has construed the phrase. The interpretation of an insurance policy presents a question of law, which we review *de novo*. *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397, ¶ 8, 187 P.3d 1107, 1110 (2008). We interpret insurance contracts "according to their plain and ordinary meaning," *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46, ¶ 11, 13 P.3d 785, 788 (App.2000), and examine the policy's terms from the standpoint of one untrained in law

or the insurance business, *Thomas v. Liberty Mut. Ins. Co.*, 173 Ariz. 322, 325, 842 P.2d 1335, 1338 (App.1992).

■ ¶ 29 The phrase "ongoing operations" in this context is not ambiguous. EMC cites *Hartford Insurance Co. v. Ohio Casualty Insurance Co.*, 145 Wash.App. 765, 189 P.3d 195, 202, ¶ 27 (2008), which held that liability arising out of "ongoing operations" means "liability that arises while the work is still in progress." [4] Adopting that definition, we hold the collision that gave rise to the stipulated judgment in this case occurred during Safety Control's "ongoing operations" because it occurred while Safety Control's work under the subcontract was "still in progress."

¶ 30 In its subcontract, Safety Control promised to "furnish and pay for all labor, services, materials, installation, tools, supplies, insurance, and equipment" required to install and maintain concrete barriers on the freeway and the access road to prevent drivers from proceeding into the construction area. Safety Control was paid on a "unit price" basis, and the subcontract separately specified the charges to install and to remove specific quantities of barriers and rent for each day each barrier was in use. The subcontract further provided that Safety Control was responsible for the barriers and required to maintain them "until completion and final acceptance of the entire project" by ADOT.

¶ 31 Under the subcontract and the undisputed facts in the record before the superior court on summary judgment, Safety Control's "ongoing operations" continued from the time Safety Control installed the barriers until the time it removed them. Accordingly, given it was undisputed that the barriers were in place and in use at the time of the collision in which Roman sustained injury, we hold the court correctly concluded on summary judgment that the collision occurred

---

4. Courts in other jurisdictions generally agree with this definition. *See Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.*, 475 F.Supp.2d 400, 410 (S.D.N.Y.2007) (" 'ongoing operations' encompasses all performance under the Contract that occurs *prior* to the completion of the contracted work"); *Weitz Co., LLC v. Mid–Century Ins. Co.*, 181 P.3d 309, 313 (Colo.App.2007) ("that [which] is going on [or] actually in process" (citations omitted)); *Mikula v. Miller Brewing Co.*, 281 Wis.2d 712, 701 N.W.2d 613, 621 (App. 2005) ("work ... 'that is actually in process,' or that is 'making progress' " (citations omitted)).

during Safety Control's "ongoing operations," within the meaning of the EMC policy.

#### 4. Work "put to its intended use."

¶ 32 EMC next argues the superior court erred by rejecting its argument on summary judgment that Roman's claim against DBA fell within a policy exclusion for injury that occurs "after ... [t]hat portion of 'your work' out of which the injury arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project." EMC argues that Safety Control's work was put to "its intended use" when the barriers were set in place. Because the collision occurred after barriers were installed, EMC argues, the "intended use" exclusion bars coverage.

¶ 33 On its face, however, the policy exclusion does not apply if Safety Control's work was put to its intended use by another contractor or subcontractor on the project. We agree with the superior court that in this context, Safety Control's barriers were put to their intended use by DBA, which had contracted for installation of the barriers to regulate traffic flow around the construction site until work was completed and ADOT accepted the project. EMC cites no authority for the proposition that in a situation such as this, devices installed to control traffic during a highway construction project are "put to [their] intended use" by the motorists whom the barriers control rather than by the contractor that has installed the barriers to control the motorists. Accordingly, we agree with the superior court that as a matter of law, this policy exclusion did not bar coverage.

#### E. Safety Control Breached the Subcontract by Failing to Procure "Completed Operations" Coverage for DBA.

¶ 34 Roman's only remaining claim against Safety Control is that it breached the subcontract by failing to procure additional insurance coverage for DBA with respect to

5. Roman expressly has disclaimed any direct indemnity claim that DBA may have had against

Safety Control's work on the construction site.[5] As noted, the EMC policy covered liability for Safety Control's "ongoing operations," but the superior court found on summary judgment that Safety Control breached by failing to also procure "completed operations" coverage for DBA. The court, however, held that Safety Control will be liable for damages only in the event that EMC fails to perform its duty under the "ongoing operations" policy to satisfy the stipulated judgment and reimburse Roman's and Colorado Casualty's attorney's fees, costs and expenses.

¶ 35 The subcontract stated that Safety Control must procure a commercial general liability insurance policy for DBA that would cover "all operations" by Safety Control, including "[c]ompleted operations and products liability" and several other specified coverages. The subcontract continued,

> Each of the above required certificates ... shall provide that a provision or endorsement has been made naming [DBA] as additional named insured[ ] as respects liabilities arising out of [DBA's] performance of the work under this Agreement, including products and completed operations liability.... Each of the above required certificates *shall also provide* that an endorsement has been made naming [DBA] as additional named insured as respects to operations performed for [DBA] and shall have attached to it a duly executed additional insured endorsement in a form acceptable to Contractor. (CG2010(3/97) [ ) ] or equivalent for the general liability.

(Emphasis added.)

¶ 36 Safety Control argues the subcontract did not require it to procure "completed operations" insurance for DBA because the policy form referenced by number in the "shall also provide" sentence recited above states that it covers an additional insured "only with respect to liability arising out of [the subcontractor's] ongoing operations performed for that insured." Even if

Safety Control.

we accept Safety Control's characterization of the industry form, the subcontract's citation to that form did not relieve Safety Control of the obligation to provide the other coverages the subcontract required. The subcontract's statement that "[e]ach of the above required certificates shall also provide" the specified endorsement plainly meant that the form endorsement would have to be procured *in addition* to the general coverage, "completed operations" and other endorsements the subcontract specified. Contrary to Safety Control's argument, the subcontract was not ambiguous in this respect. Accordingly, we agree with the superior court that as a matter of law, the subcontract required Safety Control to procure "completed operations" coverage for DBA.

¶ 37 Safety Control argues, however, that because DBA accepted Safety Control's insurance and approved Safety Control's work without objection, DBA either knowingly waived any deficiency or impliedly agreed that Safety Control provided the proper insurance coverage. This argument fails because the subcontract includes two provisions specifying that any act or failure to enforce a provision by DBA does not constitute a waiver of Safety Control's obligations to obtain the required coverage.

¶ 38 Safety Control finally argues the superior court erred by holding that Safety Control's breach may render it liable for the amount of stipulated judgment. It argues a *Damron* agreement may not be enforced against a party that is not an insurer.

¶ 39 As we understand the superior court's rulings, after concluding correctly that Safety Control breached the subcontract by failing to procure "completed operations" insurance for DBA, the court held Safety Control will be liable for damages only if and to the extent that Roman (standing in the shoes of DBA) can prove injury. If EMC ultimately covers the remaining portion of the stipulated judgment against DBA (under the policy's "ongoing operations" coverage),

along with the award of attorney's fees and costs, then no damages would flow from Safety Control's breach. But if (1) for some reason we cannot anticipate, EMC does not cover the stipulated judgment and associated fees and costs under the "ongoing operations" policy that Safety Control procured for DBA, and (2) Roman's claims against DBA would have been covered by the "completed operations" policy that Safety Control failed to provide, then and only then would Safety Control be liable for damages for its breach.

¶ 40 Safety Control correctly argues on appeal that because its liability in this event would not flow from any indemnity it owed to DBA, general rules of contract damages apply. *See* footnote 5, *supra.* This means that, by contrast to damages owed by an insurer under *Damron* or *Morris,* the amount for which Safety Control would be liable would not be measured by the stipulated judgment, but by the amount that would have been payable under the "completed operations" coverage Safety Control failed to provide. *See Frank Coluccio Constr. Co. v. King County,* 136 Wash.App. 751, 150 P.3d 1147, 1155 (2007) (damages for breach of obligation to provide insurance coverage is the "amount that would have been covered by insurance"). Accordingly, on remand, we direct the superior court to modify the judgment to make that clear and to conduct whatever additional proceedings it deems appropriate under the circumstances.[6]

## CONCLUSION

¶ 41 Although, as stated above, we have affirmed several rulings of the superior court, we reverse the judgment against EMC and remand for further proceedings consistent with this Opinion to determine whether the stipulated judgment was a liability that arose out of Safety Control's operations. In addition, we affirm the superior court's declaratory judgment against Safety Control but remand so that the court may clarify the circumstances under which Safety Control

---

6. The finder of fact might conclude that damages for which Safety Control is liable under this analysis are higher than, lower than, or the same as the stipulated judgment. We only mean that those damages are not necessarily measured by

the stipulated judgment, and we express no opinion on the ultimate outcome, except to note that in the end, Roman may recover from all sources no more than the stipulated judgment and the awards of costs and fees.

may be liable for damages and may conduct whatever further proceedings it deems appropriate to ascertain the amount of those damages. We decline all parties' requests for attorney's fees pursuant to A.R.S. § 12-341.01 without prejudice to a request for fees incurred in this appeal to be filed by the prevailing party on remand before the superior court.

CONCURRING: PATRICIA A. OROZCO and MAURICE PORTLEY, Judges.