[Civil No. 1362.   Filed May 6, 1914.]

[140 Pac. 496.]

## HORACE P. MERRILL, Appellant, v. PETER GORDON, Appellee.

1. LANDLORD AND TENANT—AGREEMENT FOR LEASE—ACTION FOR DAM-
   AGES.—For breach of an agreement for a lease, a party may either
   treat the agreement as rescinded and sue for damages, or treat
   the contract as continuing and sue for specific performance, or
   repudiate the contract and sue for recovery of any advance pay-
   ments made.

2. LANDLORD AND TENANT—ESTABLISHMENT OF RELATION—EXECUTION
   OF LEASE.—It is only where a lease has actually been made that
   the relation of landlord and tenant is established.

3. LANDLORD AND TENANT—WITHHOLDING POSSESSION—EJECTMENT.—
   When the relation of landlord and tenant exists, the lessee may
   maintain ejectment against any person, including the lessor, who
   wrongfully withholds possession of the demised premises.

   [For what property, or invasion of possession, ejectment is main-
   tainable, see note in 116 Am. St. Rep. 568.]

4. LANDLORD AND TENANT—LIABILITY FOR RENT—POSSESSION.—Delivery
   of possession of the demised premises by the lessor to the lessee is
   necessary to the lessee's obligation to pay rent; and the rule is
   the same whether the lessor refuses or is unable to give possession.

5. PAYMENT—RECOVERY—VOLUNTARY PAYMENT.—Plaintiff, after an
   agreement with defendant for a lease if he should purchase the
   stock of the then lessee, pending negotiations for such purchase,
   sent to defendant the amount of the advance payments, and there-
   after, pending, and apparently in aid of his suit against the former
   lessee and the purchaser of his stock for possession of the store
   under his alleged lease from defendant, and upon advice of coun-
   sel that it was necessary to do so in order to maintain that suit,
   sent the rental each month for more than a year, specifying it as
   rental for each month, amounting in all to $2,240. Defendant
   denied any lease, offered to hold the money for plaintiff, or to re-
   turn it to him, and, after plaintiff's negotiation for the purchase
   of the stock fell through, and after his own sale and conveyance
   of the premises, cashed the checks. *Held*, in an action to recover
   such payments, that, as plaintiff voluntarily paid the money with a
   full knowledge of all the facts, though no obligation thereto existed,
   he could not recover; defendant's statement, on demand for repay-

ment, that he owed plaintiff being immaterial as a conclusion of law, and without consideration.

6. PAYMENT—QUESTION FOR JURY—VOLUNTARY PAYMENT.—Whether a payment was made voluntarily or not is a question of law, where the facts are undisputed.

    [As to recovery of money voluntarily paid, see note in 94 Am. St. Rep. 408.]

APPEAL from a judgment of the Superior Court of the County of Cochise. Fred Sutter, Judge. Judgment reversed, with directions to dismiss complaint.

The facts are stated in the opinion.

Mr. John B. Wright, for Appellant.

Mr. J. E. Morrison, Messrs. Doan & Doan, and Mr. Robert E. Morrison, for Appellee.

ROSS, J.—The appellee was the plaintiff below, and the appellant was the defendant. The suit was instituted by plaintiff to recover of defendant the sum of $2,240, claimed to be owing upon the following remarkable state of facts:

Defendant, who resides at Benson, Cochise county, was the owner of a store building in Jerome, Yavapai county. One Lubin, a dry-goods merchant, had been his tenant for a number of years. Plaintiff, Gordon, who was Lubin's brother in law, had been in the latter's employ as a clerk in and about his mercantile business. About the 7th of March, 1911, while defendant was visiting in Jerome, Lubin informed him that he had sold, or was about to sell, his business to plaintiff, and requested defendant to make a lease of store building to Gordon. Plaintiff also talked with defendant of his purchase or proposed purchase of stock of goods, and of a lease of the store building. Lubin and defendant testified that the latter agreed to lease the building to anyone to whom a sale was made. Plaintiff testified that defendant agreed to lease building to him. As to length and terms of lease, it was agreed that plaintiff should make, in writing, his proposition to defendant, which he did on March 9, 1911, by mailing his proposition to defendant at Benson. Receiving no response from defendant, Merrill, on March 21st plaintiff wired him: "About to close deal with Lubin. How about lease?" De-

fendant answered message on same day by wire, stating that plaintiff could have building on same terms as Lubin had had it, but rejecting plaintiff's proposition of the 9th, stating that he was writing explanation. On same day, March 21st, defendant wrote plaintiff a proposition of lease for a term of "one, two or three years" at $140 per month, to be secured by bond, or, in lieu of a bond, the payment of "the last three months' rent in advance; that is, $420.00." This proposition was received by plaintiff at Jerome on March 24th, whereupon he deposited with the Branch Bank of Jerome the sum of $420, with instructions. The bank on same day wired defendant that plaintiff had made deposit, with instruction to credit his account upon receipt of three year lease. March 27th plaintiff wired defendant of his acceptance of lease, as proposed in letter of the 21st, and that he had made deposit of $420 in bank to his credit. March 28th defendant wrote plaintiff: "I received the wire from the bank regarding the deposit of $420.00 made by you for lease, but I have not accepted it yet, and no lease has been made with anyone. You can leave the deposit there until this row is settled, or you can draw it down. Better leave it there, as I think you and Lubin can get together and patch up the trouble, and then I will give you the lease on terms mentioned. . . . Now, Gordon, if Lubin says it is all right to lease to you, or if he quits business or refuses to lease the place on the terms that you offer to lease it, then I will lease to you, you come right after him, but not before him as long as he treats me right. . . ." March 31st plaintiff wrote defendant insisting that his acceptance of offer of March 21st entitled him to a lease, and stated that he had employed attorneys to enforce agreement.

The negotiations between Lubin and plaintiff came to naught, and some time in April, 1911, Lubin sold his stock to Brockway & Jones, who took possession of stock and buildings, and continued to hold same.

On April 15th, the day he claimed his lease commenced, plaintiff secured from the bank a cashier's check payable to his order for $560, being the deposit for last three months, and the rent for month from April 15th to May 15th, and, without indorsing the same, sent it to defendant. The same action was taken with reference to rent of next two months. July 15, 1911, defendant mailed these three checks to bank, and

.asked what indorsement the bank would require to have the checks cashed and placed to his credit in that bank. The bank called plaintiff's attention to this communication, whereupon plaintiff indorsed the checks, and caused his attorney to return them to defendant. On July 24th defendant wrote plaintiff's attorney acknowledging receipt of cashier's checks indorsed to him, for a total sum of $980, and in this letter he said: " . . . I hereby notify you and Peter Gordon that I absolutely refuse to accept these checks as payments for any rents, or as payments on any lease that Gordon may claim on my property, and I unconditionally and absolutely repudiate and refuse to acknowledge that Peter Gordon has any lease or any right to occupy my store building in Jerome. . . . I will take care of this money for Gordon, and hold it subject to his order, if he wishes me to do so, otherwise I will return it." The plaintiff's attorney, in a letter dated August 23d, inclosing rent for month ending September 15th, answered the above letter as follows: "You stated that you will take care of the money for Gordon, and hold it subject to his order. May advise that this information came quite awhile after you had accepted the money, and also that any money which belongs to Mr. Gordon can be taken care of by himself. At no time has he indicated that he desires you to look after his money for him." Plaintiff continued to send checks covering monthly rental until April 16, 1912, and while defendant received the checks, he made no acknowledgment of same after his letter of July 24, 1911. There were fourteen of these checks; thirteen were cashed by defendant on March 25, 1912, and the other one on its receipt soon thereafter.

Upon the above facts and some other facts disclosed in the trial, the plaintiff filed a complaint alleging an agreement for a lease, the payment of $420 as assurance that he intended to comply with the terms of the contract, the further payment of $140 per month for thirteen months from April 15, 1911, the defendant's failure to execute a lease to him, or to give possession, the sale of property by defendant after he had received the sum of $2,240, and his inability by reason thereof to make lease or deliver possession, and demand for repayment, stating, as a reason why he should recover, "that the

plaintiff has received no consideration or anything of value from defendant for sums of money so paid.''

The defendant in his answer admits receiving the sum sued for, and that he has failed and refused to return it, and that he has sold and conveyed the property, and cannot execute and deliver any lease or leasehold rights therein to plaintiff or anyone else. As a further answer, he sets forth the facts practically as we have given them, with the explanation that, at the time he wrote proposition of lease on March 21, 1911, he believed that plaintiff had purchased the Lubin stock of goods, and that he first learned on March 24th that the deal between plaintiff and Lubin had been declared off; that his proposition of lease was conditioned upon Lubin's selling to plaintiff, and that he so notified plaintiff upon learning the facts; that on the first day of May, 1911, the plaintiff insti-tuted an action in the courts of Yavapai county against Lubin and Brockway & Jones, to whom Lubin had in the meantime sold his stock of merchandise, for the possession of the store building, alleging a lease of said property from defendant, beginning April 15, 1911, and that the litigation was pending until October 7, 1912, when it was finally determined against plaintiff; that, pending the litigation in the Yavapai county courts, plaintiff continued to remit to him drafts each month for the payment of rental; ''that defendant refused to accept any moneys under such alleged lease, and on several occasions had returned to plaintiff the $420 and other monthly pay-ments, with full explanation of the entire situation; that, not-withstanding the above facts, the plaintiff voluntarily would return drafts to defendant and insist that defendant accept the same; that the same were paid by plaintiff to defendant under no mistake of facts by plaintiff whatever, but that the same were voluntary payments made by plaintiff to defendant without fraud, duress or extortion, and with a full knowledge of the facts.''

A jury trial was had. The evidence submitted to the jury consisted of what we have detailed above; the statement by defendant that he did not repay that $2,240 ''because he did not believe plaintiff could collect it from him, and that the consideration plaintiff received therefor was the right to sue Lubin'' for possession of building; and the testimony of plain-tiff that he kept paying defendant lease money pending his

suit against Lubin and Brockway & Jones, being advised by his attorney that it was necessary to do so in order successfully to maintain that suit. Practically the only conflict of the evidence arose over what was said by defendant to plaintiff when the latter went to Benson to try to collect the demand. Plaintiff testified that defendant then said to him: "Yes; I know I owe it to you, but I may beat you out of it." Defendant, when asked if that statement was true, said: "Nothing was said about beating him out of his money at all." "He said that he would give me six months' time, and I says to him—he said he would give me six months' time if I would give him security, and I didn't want to give him a decided answer then."

The verdict of the jury was against the defendant for the full amount of demand, upon which judgment was entered in favor of plaintiff.

The defendant complains of the judgment for two reasons: (1) That the complaint and all of the evidence show that the plaintiff voluntarily paid the money sued for with a full knowledge of all the facts, and that therefore the complaint does not state a cause of action, nor do the facts make out a case in which he should be permitted to recover; (2) that the court erred in submitting the case to the jury and in its instructions to the jury.

Giving full force and effect to all the negotiations between plaintiff and defendant concerning the lease of store building, the most that can be made of it is that it amounted to an agreement for a lease only.

Proceeding upon the theory that it was nothing more than an agreement for a lease, and that is the theory of the complaint, for a breach of such agreement the plaintiff's remedies were to treat the contract as rescinded and sue for damages, or to treat the contract as continuing and sue for its specific performance. If the terms of the agreement called for any assurance money or any rent money in advance and as a condition of executing the lease, it was incumbent upon plaintiff to make such payment, or make a legal tender thereof. Having done as much, he was in a position entitling him to prosecute either of the above-named remedies, upon a refusal of the defendant to perform his part of the agreement, or, in

lieu thereof, if he so chose, he could repudiate the contract and sue in *assumpsit* to recover advance payments.

It is only where a lease has actually been executed that the relation of landlord and tenant is established. When that relation exists, and "possession of the demised premises is withheld from the lessee, he may maintain an action of ejectment against any person, including the lessor, who so wrongfully withholds the possession from him; or, if possession is withheld by the lessor, or one claiming under him, the lessee may, at his option, repudiate the contract, or bring an action for damages against the lessor for a breach of his agreement." 24 Cyc. 1051.

At all events, "delivery of possession of the demised premises by the lessor to the lessee is necessary to the obligation to the latter to pay rent; and the rule is the same whether the lessor refuses or is unable to give possession." 24 Cyc. 1145; *Sullivan* v. *Schmitt,* 93 App. Div. 469, 87 N. Y. Supp. 714; *Smith* v. *Barber,* 96 App. Div. 236, 89 N. Y. Supp. 317.

The plaintiff was not in possession, he had no lease, and could not maintain a suit for possession, he was under no obligation to pay rent; yet, notwithstanding he was fully informed as to all these facts, and was charged with knowledge of their legal effect, he voluntarily and persistently continued to press upon defendant the assurance money of $420 and the monthly rental for thirteen months against defendant's repeated refusals and protests. These payments (except the assurance money) were made as the rental for the current months from April 15, 1911, to May 15, 1912, and, should the plaintiff have succeeded in obtaining possession of premises as the result of his suit in the Yavapai county courts, or otherwise, these payments could not have been applied in satisfaction of rental for any other months. The plaintiff had directed their application to the payment of the rental for these particular months. What was his purpose in making the payments? Surely not with the idea of recovering the money in case he obtained possession of premises, nor, in that event, of applying the payments on future rent. Plaintiff says he kept on paying rent pending his suit for possession, "being advised by his attorney that it was necessary to do so in order successfully to maintain his suit." The rental money was therefore avowedly paid in aid of his suit against Lubin,

Brockway and Jones for possession of premises. The facts as to the assurance money are in the same situation. Defendant refused not once, but several times, to accept it, going so far as to return the check covering this item, with others for rent, two or three times. He held the checks until March 25, 1912, before he cashed them, on which date he cashed thirteen of them, and even after that plaintiff sent him a check for the rent for the month from April 15 to May 15, 1912.

Clearly, every dollar of this money was paid by plaintiff to defendant without any consideration whatever, and it is equally as clear that it was voluntarily paid with a full knowledge of all the facts. In 2 Parsons on Contracts, ninth edition, section 14, the author says: ''When the consideration appears to be valuable and sufficient, but turns out to be wholly false or a mere nullity, or where it may have been actually good, but, before any part of the contract has been performed by either party, and before any benefit has been derived from it to the party paying or depositing money for such consideration, the consideration wholly fails, there a promise resting on this consideration is no longer obligatory, and the party paying or depositing money upon it can recover it back. . . . While it is true that a failure of consideration is a good ground for the recovery of the money paid, it is a familiar and well-settled principle of law that, where a person with full knowledge of all the circumstances pays money voluntarily, and without compulsion or duress of persons or goods, he shall not afterward recover back the money so paid. But money paid by a mistake of fact which causes an unfounded belief of a liability to pay may generally be recovered back, even if the mistake arises from negligence; but not if the mistake affects only the motives of the party in paying the money, and not his obligation.''

In this case the consideration, neither in fact nor law, had the appearance of being ''valuable and sufficient,'' but was purely and simply in all its aspects voluntary, and against the protest and renunciation of right by defendant was paid to him.

*Copper Belle Min. Co.* v. *Gleeson,* 14 Ariz. 548, 134 Pac. 285, was a suit by the company in *assumpsit* for money had and received. After reciting the facts in the case, Chief Jus-

tice FRANKLIN said: "With full knowledge of all the facts, without any instrumentality upon the part of Gleeson influencing its action, but in opposition to his wishes, it paid the redemption money into the hands of the sheriff, and took its chances in a lawsuit to quiet title to the property. True, in the action it subsequently brought for such purpose, Gleeson was successful in maintaining the Fitzmaurice location, but that is a matter which the redemptioner should have considered before it parted with the money and took just the title and interest which the San Remo Copper Mining Company had. If the matter turned out very differently from what was expected, the miscalculation is not such a mistake, either of fact or of law, within the meaning of the equitable doctrine, as entitles the disappointed party to any relief. The appellant was in a position to calculate the chances, and it certainly assumed the risks." In that case we placed this court in the ranks of the great majority of the courts of this country, and held that a voluntary payment with full knowledge of the facts, in the absence of fraud, duress or coercion, could not be recovered back.

The defendant, in his letter of July 24, 1911, acknowledging the receipt of $980, refused unconditionally to accept the same as payment for rent or as payment on any lease, and said: "I will take care of this money for Gordon and hold it subject to his order, if he wishes me to do so; otherwise I will return it." Had plaintiff accepted the offer of defendant to act as accommodation bailee or depository of the moneys that were being forced upon him, his action for money had and received probably could be maintained (27 Cyc. 867), in the absence of simulation or fraud between the plaintiff and defendant for the purpose of ousting Lubin, Brockway and Jones from premises, in which case the courts would refuse aid to both of the wrongdoers, for such they would have been. The plaintiff, however, flatly and most forcibly refused the offer of defendant in this language: "Any money which *belongs* to Mr. Gordon can be taken care of by himself. At no time has he indicated that he desires you to look after *his money* for him." Plaintiff disclaimed ownership of the moneys he was sending defendant, and asserted his ability to care for his own, and rejected the good offices of defendant as keeper for his use and benefit of the very sums that he

XV Ariz.—34

now sues for as owner. Not only that, but the plaintiff renounced ownership of several months' rental thereafter; for month after month he mailed checks to defendant, accompanying each check with language like this: "I am sending you check for $140.00 rent for your building for month ending September 15th"—thus freely, voluntarily and forcibly making the payments and directing their application to particularly named months. What was defendant to do in the circumstances? He had returned several checks several times, only to have them sent back to him. He was forbidden to hold them for plaintiff, and was told to apply them for rent of his building. If plaintiff insisted on playing the game against the protest of the defendant, we conclude it was because he was willing to take "a long chance" at getting even with his brother in law, Lubin, for success in his litigation for the possession of the building would have forced Lubin to sell him his stock of merchandise or "be left out in the rain," or he might have reasoned that his litigious efforts would force a surrender of the building and a sacrifice sale of stock. Whatever his motive, whether in aid of his suit for possession of premises, or to drive a bargain with his brother in law, the bald fact remains that he made the payments of his own free will and with a full knowledge of all the facts.

The plaintiff testified that defendant, some time after all the money had been paid to him, and after he had spent it, admitted an indebtedness in these words: "Yes; I know I owe it to you, but may beat you out of it." Defendant, in his testimony, denied saying that he might beat plaintiff out of it, but does not deny admitting that he owed it to plaintiff. Grant that defendant said to plaintiff, upon being asked for a return of the money, "Yes; I know I owe it to you," that of itself would not establish the relation of creditor and debtor. Defendant might have believed that he owed the plaintiff, but his belief would not make it so. It was merely his conclusion from the facts—an expression of his opinion. If defendant had said, "I know I do not owe it to you," it would have been merely his opinion or conclusion. In neither case would his opinion or conclusion be of any probative value, except as supported by the detailed statement of the facts upon which it was based.

Even a gift *inter vivos* irrevocably invests title in the donee. 22 Cyc. 1212. The donee might, on being asked for the return of a perfected gift, under the generous influence of the situation, acknowledge that he owed the donor, but such acknowledgment would be without consideration and unenforceable. The donee of a perfected gift is the absolute owner of it, and as much so against the donor as all the rest of the world. If that is true of gifts, *a fortiori* voluntary payments with a full knowledge of all the facts, as in this case, irrevocably vest title of the property in the payee. He becomes the absolute owner against the payer, and as much so as against all the rest of the world. His statement, "I know I owe it to you," was therefore not only his conclusion, but, if considered as an admission of a fact, it was without consideration and not enforceable.

The writer hereof desires to state that he has found the solution of the controverted question a most difficult problem, largely because he was disinclined to solve it according to the standard of rules that have been adopted in solving similar problems by practically all the courts of this land. It seemed that defendant was getting something for nothing. At first glance the imprecation contained in the first sentence of plaintiff's brief, wherein it is said: "Voluntary payment is so repugnant to justice and right and honesty as between man and man," seemed justified. Indeed, if the plaintiff was here asking relief by guardian, we conceive it should be granted.

We have always understood the law to be that persons under no legal disability, as a general rule, have power to do as they wish with their own. They may enter into contracts; they may give away their substance; they may spend it for mere baubles; they may exchange it for high and riotous living; it may go to satisfy vanity or pride or ambition; and the courts are helpless to say nay or to control their freedom of action in those respects. Courts are not instituted to control and supervise the private dealings of persons *compos mentis* who are upon an equal footing and labor under no restraint of person, property, or mind, such as fraud, duress, coercion, or extortion. Freedom of contract and freedom in the use and disposition of one's own are no less sacred than freedom of speech. If defendant had offered the plaintiff the sole and exclusive easement of the skies of Arizona in

perpetuity for aerial navigation for $2,240, and the plaintiff, with full knowledge of the facts, had accepted the proposition and paid the price voluntarily, the courts could not aid in its recovery, unless suit for its recovery should be prosecuted by his guardian.

The general rule as to voluntary payments is stated in 30 Cyc. 1298, as follows: "Except where otherwise provided by statute, a party cannot by direct action or by way of setoff or counterclaim recover money voluntarily paid with a full knowledge of all the facts, and without any fraud, duress or extortion, although no obligation to make such payment existed." And this is the rule adopted by the English courts, the federal courts, and all the state courts, except the states of Georgia and Kentucky. To cite individual cases upholding the doctrine announced would be an easy matter, but would serve no useful purpose, and only extend the length of this opinion, already too long.

There were no material facts in dispute, and therefore no questions for a jury to decide. "Whether a payment was made voluntarily or not is a question of law, where the facts are undisputed." *Eslow* v. *City,* 153 Mich. 720, 22 L. R. A., N. S., 872, 117 N. W. 328.

Without deciding whether the complaint states facts sufficient to constitute a cause of action in *assumpsit* for money had and received, it is clear to our minds that the plaintiff's evidence failed to sustain such action.

We think we should state that the attorneys who appear for plaintiff on this appeal had no part in getting the plaintiff in the predicament disclosed by this record. Their reliance here for relief was necessarily upon a failure of consideration and the ignoring of the doctrine of voluntary payment with full knowledge of the facts. To uphold their position would be to say that ignorance of the law alone excuses. As we said in *Copper Belle Mining Co.* v. *Gleeson, supra,* quoting from Pomeroy, Equity Jurisprudence: "The administration of justice, the law itself as a practical system of the regulation of human conduct, requires that some fundamental assumptions should be made as postulates. The most important of all these is the assumption that all persons of sound and mature mind are presumed to know the law. If ignorance of the law were generally allowed to be pleaded,

there would be no security of legal rights, no certainty in judicial investigations, no finality of litigation.''

Judgment is reversed, with directions to dismiss complaint.

FRANKLIN, C. J., and CUNNINGHAM, J., concur.

NOTE.—As to the implied duty of a lessor to put the lessee in possession of leased premises, see notes in 9 L. R. A., N. S., 1127, and 21 L. R. A., N. S., 239.