NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STARR SURPLUS LINES INSURANCE COMPANY, *Plaintiff/Appellant*,

*v.*

STAR ROOFING, INC., et al., *Defendants/Appellees*.

No. 1 CA-CV 18-0641
1 CA-CV 18-0642
(Consolidated)
FILED 10-31-2019

Appeal from the Superior Court in Maricopa County
No. CV2014-015362
The Honorable Margaret R. Mahoney, Judge

**AFFIRMED**

COUNSEL

Lorona Mead, PLC, Phoenix
By Frank R. Mead
*Co-Counsel for Plaintiff/Appellant*

Phillips Law Corporation, Santa Ana, California
By Brent Randall Phillips
*Co-Counsel for Plaintiff/Appellant*

Gust Rosenfeld P.L.C., Phoenix
By Jay R. Graif
*Co-Counsel for Defendant/Appellee Star Roofing, Inc.*

Murphy Cordier PLC, Phoenix
By Michael A. Cordier
*Co-Counsel for Defendant/Appellee Star Roofing, Inc.*

Kutak Rock LLP, Scottsdale
By Michael W. Sillyman, London A. Burns
*Counsel for Defendant/Appellee Transwestern Commercial Services Arizona, LLC*

Freeman Law PLLC, Scottsdale
By Shelton L. Freeman
*Counsel for Amicus Curiae National Roofing Contractors Association and Asphalt Roofing Manufacturers Association*

---

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Michael J. Brown joined.

---

**W I N T H R O P**, Judge:

¶1 In this consolidated appeal arising from a declaratory judgment action, Starr Surplus Lines Insurance Company ("Starr Surplus") appeals separate summary judgments entered in favor of Star Roofing, Inc. ("Star Roofing") and Transwestern Commercial Services Arizona, LLC ("Transwestern"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2 This insurance coverage action arises out of an underlying lawsuit filed by Maria Delarosa ("Delarosa") against Star Roofing, Transwestern, and Camelback Consulting, LLC ("Camelback"). The primary dispute in this case is whether the insurer, Starr Surplus, may deny coverage under the parties' insurance policy.

¶3　　　　In May and June 2012, Star Roofing performed roofing work on a commercial building in Tempe.　Delarosa was employed by US Airways, which was a tenant in the building.

¶4　　　　On July 2, 2012, Delarosa fractured her right forearm and suffered other bodily injury when she allegedly passed out and fell in the building's parking lot as she was leaving work.　In 2014, Delarosa sued Star Roofing, Transwestern (the property manager), and Camelback (the construction consultant), alleging she had suffered her injuries as a result of being overcome by breathing the fumes released from Star Roofing's work while she was at work inside the US Airways' building.

¶5　　　　Before engaging in the roofing project, Star Roofing had obtained a commercial general liability insurance policy issued by Starr Surplus ("the Starr Policy"), which covered a period from September 30, 2011 to September 30, 2012.　As the property manager of the building, Transwestern was named as an additional insured on the Starr Policy.

¶6　　　　Star Roofing tendered the defense of the underlying action to Starr Surplus under the Starr Policy.　Starr Surplus retained Claims Direct Access ("CDA") as a third-party claims adjudicator concerning the Delarosa claim.　In November 2014, Starr Surplus agreed to defend Star Roofing, albeit subject to a reservation of rights based on a pollution exclusion endorsement attached to the Starr Policy.

¶7　　　　In addition to being named as an additional insured on the Starr Policy, Transwestern was insured under a commercial general liability insurance policy issued by Zurich American Insurance Company ("Zurich") and tendered its defense to Zurich.　Zurich accepted Transwestern's tender and appointed Don Skypeck to defend Transwestern.　Skypeck tendered Transwestern's defense of the Delarosa action to Star Roofing and Starr Surplus.　John Belanger, counsel for Star Roofing, initially rejected the tender, claiming a disparity of interests existed between Transwestern and Star Roofing.　Orin Allen was the CDA claims administrator assigned to handle Transwestern's tender, and was the point of contact with Skypeck on behalf of Starr Surplus relative to that tender of defense.　In January 2015, Starr Surplus agreed to defend Transwestern, although the parties disagree whether Starr Surplus assumed Transwestern's defense under a reservation of rights.　Belanger now believed a conflict between the interests of Star Roofing and

Transwestern could be avoided, and he undertook the defense of Transwestern in conjunction with his defense of Star Roofing.[1]

¶8          Meanwhile, on December 31, 2014, Starr Surplus initiated the declaratory judgment action out of which this appeal arises, naming Star Roofing and Delarosa as defendants, and seeking a determination that the subject pollution exclusion barred coverage for Delarosa's personal injuries claim in the underlying action.  On July 15, 2015, approximately six months after it had assumed Transwestern's defense, Starr Surplus filed a First Amended Complaint, naming Transwestern as an additional defendant in its declaratory judgment action.  In the First Amended Complaint, Starr Surplus alleged—for the first time, according to Transwestern—that Starr Surplus had assumed Transwestern's defense subject to a reservation of rights.

¶9          On August 21, 2015, Starr Surplus mailed a signed reservation of rights letter dated January 13, 2015 to Skypeck—who was no longer representing Transwestern—and Skypeck received the letter on August 24.  Transwestern, however, disputed having previously received that reservation of rights letter, or any other timely reservation of rights notification, from Starr Surplus.  Transwestern argued that, by his own deposition testimony, Allen admitted that while he had received a coverage opinion and proposed reservation of rights letter from CDA coverage counsel and obtained approval on January 14, 2015 to issue that reservation, he had no documentation to reflect that the reservation of rights was provided to Skypeck or any other Transwestern representative prior to August 2015.

¶10          In June 2016, Transwestern moved for summary judgment on the defenses of waiver, estoppel, and laches.  Transwestern argued Starr Surplus should be precluded from denying coverage because there had been an unreasonable delay between the time Starr Surplus assumed Transwestern's defense in the Delarosa action and when Starr Surplus communicated the reservation of rights to Transwestern.  Transwestern further argued it had been prejudiced, in part because Starr Surplus had engaged Belanger to represent Transwestern at the same time Belanger was already representing the contrary and conflicting interests of Star Roofing, and Skypeck had only agreed to Belanger's representation of Transwestern

---

[1]     Belanger believed he could represent both Star Roofing and Transwestern subject to execution of waivers of a potential conflict of interest, but conflict waivers were not obtained from either Star Roofing or Transwestern.

because he had been led to believe there was no reservation of rights asserted with respect to Transwestern and Transwestern was fully protected. Further, Transwestern maintained Skypeck did not continue to pursue Transwestern's rights as against others—including US Airways, Camelback, and Camelback's insurer, American Casualty Insurance—after Starr Surplus assumed Transwestern's defense without a reservation of rights.

¶11            Starr Surplus opposed the motion, submitting a controverting affidavit from Allen that stated Allen had been "misled" during his deposition[2] and that he actually had reviewed the reservation of rights and prepared the associated letter on January 13, 2015, and then after obtaining approval from his supervisor, mailed the reservation of rights letter to Skypeck on January 14, 2015. Transwestern replied, moved to strike that portion of the Allen affidavit as a "sham affidavit," and requested sanctions for a declaration submitted in bad faith. After further responsive memoranda by the parties and oral argument, the superior court took the matters under advisement.

¶12            In January 2017, the superior court granted Transwestern's motion for summary judgment on the defenses of waiver, estoppel, and laches, explaining as follows:

> The Court finds that [Starr Surplus] delayed notifying TransWestern of a reservation of rights and that there is/was prejudice to TransWestern. In addition, the Court finds [Starr Surplus'] attempt to overcome the evidence with a sham declaration falls short.

¶13            On February 1, 2017, Transwestern filed an application for attorneys' fees and costs as the prevailing party pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-341.01 and 12-341. Transwestern also filed a Notice of Lodging Proposed Form of Judgment pursuant to Arizona Rule of Civil Procedure ("Rule") 54(b). After the parties filed responsive memoranda, the superior court found Transwestern's fee application "premature" and ordered that "[t]he issue of attorney's fees shall abide resolution of the matter," effectively holding the application in

---

[2]     Following the deposition, Allen was provided with a certified transcript of his testimony and the opportunity to make any changes to the certified transcript, but Allen never returned any notice of errata.

abeyance and effectively continuing Transwestern's presence in the declaratory action.

¶14          In March 2017, Starr Surplus and Star Roofing filed cross-motions for summary judgment to determine the application of the pollution exclusion to the claims alleged in the Delarosa action. Over the next several months, Starr Surplus and Star Roofing filed numerous responsive memoranda and motions. Delarosa joined in Star Roofing's motion for summary judgment, but by October 2017, the underlying Delarosa action was settled, and Delarosa was dismissed from the declaratory judgment action, although the remaining parties continued to seek a declaration as to their rights and responsibilities under the Starr Policy.

¶15          In April 2018, the superior court held oral argument on Starr Surplus' and Star Roofing's cross-motions for summary judgment. On April 27, the court, after finding no disagreement between the parties as to the established material facts, granted Star Roofing's motion for summary judgment and denied Starr Surplus' motion. Relying primarily on *Keggi v. Northbrook Property & Casualty Insurance Co.*, 199 Ariz. 43 (App. 2000) (review denied Oct. 3, 2001), the court concluded the pollution exclusion attached to the Starr Policy did not apply to exclude coverage for the claims alleged in the Delarosa action:

> The Court finds *Keggi* . . . to be directly relevant authority on the issue presented in the cross-motions, specifically, whether the pollution exclusion provision in the Policy encompasses the underlying occurrence so as to exclude it from coverage, absolving [Starr Surplus] of the responsibility to defend or indemnify [Star Roofing] for claims related to the underlying occurrence. Much of the parties' analysis focused on whether the underlying occurrence was a "traditional environmental pollution" event. The Court has reviewed all the cases briefed and argued by the parties in support of their opposing positions. The Court recognizes that there is not a simple test to determine whether an event is a traditional environmental pollution event. However, the Court finds the underlying event in this matter is not a traditional environmental pollution event.
>
> [Starr Surplus'] view of what is encompassed within the definition of "pollutant" under the Policy is extremely

expansive. The Court does not find persuasive the opinions of [Starr Surplus'] expert Dr. Hope (Nadia) Moore. However, even if the roofing materials used by [Star Roofing] fall under the Policy definition of "pollutant[,"] the circumstances presented do not constitute "traditional environmental pollution[."] The Court finds that the credible evidence established convincingly that the roofing materials used by [Star Roofing] were commercially available, used by [Star Roofing] for the purposes and in the manner intended, and not misused or abused by [Star Roofing], who simply employed the materials in the normal, ordinary and anticipated course of doing an otherwise unremarkable roofing job. When [Starr Surplus] wrote the policy, [Starr Surplus] knew what [Star Roofing's] business was and what processes [Star Roofing] employed. There was no spill, no mishandling, and no improper use, disposal[,] or containment of [Star Roofing's] products; rather, the products were used as all parties had foreseen them being used. There was in fact no "event" identified with [Star Roofing's] products or processes, other than DeLaRosa's claim that she was injured by the fumes from the roofing materials used.

The Court further finds that consideration of the *Keggi* factors leads to the conclusion that this is not an instance of "traditional environmental pollution." The purpose of the clause, public policy[,] and the transaction as a whole demonstrate that the pollution exclusion provision should not include the circumstances underlying the claims at issue in this matter.

In addition to the authority provided in *Keggi*, [Star Roofing] cited as guidance and support for the analysis urged by [Star Roofing], two recent and relevant decisions from the U.S. District Court for the District of Arizona. See *Nat'l Fire Ins. Co. of Hartford v. James River Ins.*, 162 F. Supp. 3d 898 (D. Ariz. 2016); *Saba v. Occidental Fire & Casualty Co. of North Carolina*, 2014 WL 7176776 (D. Ariz. Dec. 16, 2014). The Court agrees that both decisions offer instructive guidance in analyzing the pending cross-motions for summary judgment and support the conclusion that the pollution exclusion provision should not be interpreted and applied as urged by [Starr Surplus].

**¶16** On May 10, 2018, Star Roofing filed a Notice of Lodging (Proposed) Form of Judgment, and Transwestern filed a Notice of Lodging Proposed Form of Judgment on May 11. On June 4, 2018, Star Roofing filed an application for attorneys' fees and costs under A.R.S. §§ 12-341.01 and 12-341, and Transwestern filed a second, updated application. Starr Surplus moved to strike and otherwise objected to the applications. After further briefing and additional motions, the superior court denied Starr Surplus' motions to strike and granted Star Roofing's and Transwestern's applications, awarding each the full amount of their requested attorneys' fees and costs.

**¶17** In September 2018, the superior court entered separate judgments pursuant to Rule 54(b) in favor of Star Roofing and Transwestern. Starr Surplus timely appealed from each judgment, and this court consolidated the appeals. We have jurisdiction of the consolidated appeal pursuant to A.R.S. § 12-2101(A)(1).

**ANALYSIS**

*I. The Superior Court's Grants of Summary Judgment*

**¶18** Starr Surplus argues the superior court erred in granting summary judgment in favor of Star Roofing and Transwestern.

*A. Standard of Review and Applicable Law*

**¶19** Summary judgment is appropriate if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). If there are material facts upon which reasonable people could reach different conclusions, summary judgment is not appropriate. *Gulf Ins. Co. v. Grisham*, 126 Ariz. 123, 124 (1980). In deciding a motion for summary judgment, courts make no distinction between direct and circumstantial evidence. *Mobilisa, Inc. v. Doe*, 217 Ariz. 103, 113, ¶ 34 (App. 2007).

**¶20** We review *de novo* the grant of summary judgment, viewing the facts and all reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered. *Felipe v. Theme Tech Corp.*, 235 Ariz. 520, 528, ¶ 31 (App. 2014) (citation omitted). "Summary judgment should be granted 'if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.'" *Aranki v. RKP Invs., Inc.*, 194 Ariz. 206, 208, ¶ 6 (App. 1999) (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990)).

*B. Summary Judgment for Star Roofing*

**¶21** Starr Surplus argues the exclusionary endorsement attached to the Starr Policy, commonly referred to as the "pollution exclusion," clearly and unambiguously excludes coverage for claims alleging injury caused by a pollutant. Starr Surplus further argues that we should re-examine *Keggi*, which Starr Surplus asserts represents the "minority" position that application of the pollution exclusion is limited to excluding coverage for traditional pollution occurrences,[3] and overturn *Keggi*, limit its holding, or otherwise seek to distinguish it.

**¶22** Contrary to Starr Surplus' suggestion on appeal, there is no indication that the *Keggi* court failed to engage in a meaningful analysis in finding the pollution exclusion in an insurance policy should be applied narrowly and exclude only traditional environmental pollution events, *see* 199 Ariz. at 49, ¶ 23, such as improper disposal or containment of hazardous waste. The *Keggi* court correctly concluded that applying the pollution exclusion any more broadly could lead to "absurd results" and otherwise eviscerate coverage reasonably expected by the insured under a commercial general liability policy. *Id.* at 49-50, ¶ 27. Further, because Starr Surplus offers, and we discern, no compelling reason to disagree with, minimize, or distinguish *Keggi*, we decline to do so and instead follow an analysis similar to that provided by the federal district court in *Saba*.

**¶23** The interpretation of an insurance contract is a question of law subject to *de novo* review. *Liristis v. Am. Family Mut. Ins. Co.*, 204 Ariz. 140, 143, ¶ 13 (App. 2002). Provisions of an insurance policy must be construed according to their plain and ordinary meaning, and the language must be viewed from the standpoint of the average layperson who is untrained in the law or the field of insurance. *Id.* When an insurance policy is subject to different interpretations, we interpret the policy provisions by examining their specific language, public policy considerations, and the purpose of the transaction as a whole. *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 257 (1989). If any ambiguity in the insurance policy remains, we construe the ambiguity against the insurer, particularly when it involves an exclusionary clause. *Teufel v. Am. Family Mut. Ins. Co.*, 244

---

[3] Star Roofing argues to the contrary, that the majority of courts that have considered this issue require an insurer to establish that a plaintiff's alleged injuries arise out of a "traditional environmental pollution event," e.g., an unintended toxic chemical spill or during a hazardous waste remediation effort, before a pollution exclusion clause applies to exclude coverage.

Ariz. 383, 385, ¶ 10 (2018); *Coconino Cty. v. Fund Adm'rs Ass'n*, 149 Ariz. 427, 431 (App. 1986).

¶24 The Starr Policy provides in pertinent part as follows:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> > (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]
> >
> > (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

The relevant text of the "Total Pollution Exclusion With a Hostile Fire Exception" in the Starr Policy further provides as follows:

> This insurance does not apply to:
>
> f. Pollution
> > (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time. . . .
> >
> > (2) Any loss, cost or expense arising out of any:
> >
> > > (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or
> > > (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way

responding to, or assessing the effects of, "pollutants".

The Starr Policy defines "pollutants" as:

> [A]ny solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, radiation or radioactive contamination, dioxins, polychlorinated biphenols, pathogenic or poisonous biological or chemical materials and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

¶25　　　　In *Keggi*, this court narrowly interpreted pollution exclusion clauses that were in all relevant respects indistinguishable from the pollution exclusion clause presented here by Starr Surplus. *See* 199 Ariz. at 46-47, 51, ¶¶ 14, 32. Insurers had sought to apply pollution exclusions to a plaintiff's claims for injuries caused after she ingested "total and fecal coliform bacteria" contained in contaminated water from supposedly potable water taps. *Id.* at 44–45, ¶ 3. This court held that the plain language of the policy definitions for pollution did not include "bacteria," and thus the asserted pollution exclusions did not apply. *Id.* at 50-51, ¶¶ 30, 33. But, we went on to hold that, even if the policy language could be interpreted broadly enough to include bacteria, "the purpose of the clause, public policy, and the transaction as a whole, demonstrate[d] that the language [of the pollution exclusion] nevertheless should not be interpreted to preclude coverage for bacterial contamination absent any evidence that the actual contamination arose from traditional environmental pollution." *Id.*

¶26　　　　Thus, we determined that the standard pollution exclusion does not apply to exclude coverage for physical injury that arises in contexts other than traditional environmental pollution or attempted remediation of same. *See id.* at 49, ¶ 23. In so holding, we relied on (1) the language and history of the pollution exclusion, (2) public policy, and (3) the transaction as a whole. *Id.* at 47-50, ¶¶ 15-29.

¶27　　　　We noted in *Keggi* that "the exclusion clause appears to describe events, places, and activities normally associated with traditional environmental pollution claims," *id.* at 48, ¶ 22, and in relation to the language of the exclusion, we stated,

> These provisions appear to be directed at industrial insureds who must handle, store, and treat "hazardous wastes" in conducting their daily operations. Similarly, . . . [provisions

in the clause] appear to be intended to preclude coverage for clean-up operations ordered under RCRA [the Resource Conservation and Recovery Act], CERCLA [the Comprehensive Environmental Response, Compensation, and Liability Act], and other federal or state environmental laws. Thus, the exclusion's context confirms that the drafters intended it to apply to traditional "environmental pollution" situations and substances.

*Id.* at 48–49, ¶ 22.

**¶28**　　　　The language from the pollution exclusion clause in the Starr Policy is not meaningfully distinct from that examined in *Keggi*. As in *Keggi*, the pollution exclusion here applies to the "discharge, dispersal, seepage, migration, release or escape of pollutants." *Id.* at 46, ¶ 14. Many of these terms are borrowed directly from environmental statutes. *See, e.g.*, *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30 (1st Cir. 1999) ("[T]he terms used in the exclusion clause, such as 'discharge,' 'dispersal,' 'release' and 'escape,' are terms of art in environmental law and are generally used to refer to damage or injury resulting from environmental pollution." (citations omitted)). Just as in *Keggi*, the language in the pollution exclusion here "appear[s] to be directed at industrial insureds who must handle, store, and treat 'hazardous waste[.]'" 199 Ariz. at 48, ¶ 22. For example, the subject exclusion precludes liability from government agencies or from others for "testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, 'pollutants.'"

**¶29**　　　　In *Keggi*, this court went on to explain the history behind exclusion clauses supports the conclusion that they were "intended to exclude coverage for causes of action arising from traditional environmental pollution." *Id.* at 49, ¶ 23. "Historically, the pollution exclusion clauses arose in [commercial general liability] policies in the 1970's, in response to 'the insurance industry's increased concern about pollution claims attributable to environmental catastrophes that occurred during the 1960s.'" *Id.* (brackets and citations omitted). In addition, other courts "have restricted the [pollution] exclusion's scope to only those hazards traditionally associated with environmental pollution." *Nautilus*, 188 F.3d at 31 (citations omitted); *accord Keggi*, 199 Ariz. at 49, ¶ 23 (citing cases). Starr Surplus points to no persuasive authority suggesting the exclusion clause in the Starr Policy has a history distinct from that of the pollution exclusion clauses examined in *Keggi*.

¶30        After reviewing this history, *Keggi* concluded that "public policy supports an interpretation limiting the clause to its initial, intended purpose of excluding coverage for traditional environmental pollution-related claims." 199 Ariz. at 49, ¶ 27.

¶31        Finally, in *Keggi*, we held that "the transaction as a whole supports a finding that the exclusion does not apply." *Id.* at 50, ¶ 29. We considered the circumstances surrounding the transaction and found the policy "contemplated the operation of golf clubs and restaurants, and even the provision of water through its water company." *Id.* We determined that "[w]here the insured's operations include distribution or serving of water, an insured would reasonably expect to be covered for negligently distributing or serving contaminated water which causes an illness or disease." *Id.* (citations omitted).

¶32        We do not disagree with Starr Surplus' premise that the component materials of the asphalt roof primer, permanent adhesive, and pre-flashing cement used by Star Roofing may be classified as hazardous substances under state and federal statutes and should not be handled without the use of protective equipment due to their caustic nature. As Starr Surplus further notes, inhalation of the chemicals can cause irritation to the respiratory tract and mucous membranes, dizziness, blurred vision, and headaches.

¶33        The fumes resulting from the roofing work are a gas—likely more benign than total and fecal coliform bacteria—but as we noted in *Keggi*, the phrases "irritant" and "contaminant" are hopelessly imprecise. *Id.* at 47, ¶ 15 (citations omitted). Further, the fact that Starr Surplus attempts to rely on the Moore Declaration to establish that the chemicals used by Star Roofing qualify as pollutants under the Starr Policy undercuts Starr Surplus' position that the terms of the policy are not ambiguous. And although Moore is an environmental toxicologist, nothing in the record indicates she is an expert in insurance coverage or contract/policy interpretation, or otherwise has any special knowledge concerning the terms of the Starr Policy. The superior court therefore committed no error in finding her opinion unpersuasive as to the ultimate issue in this case.

¶34        Moreover, because the policy language of the pollution exclusion may be read so broadly as to effectively eviscerate coverage, its ambiguous terms must be further examined through the lens of *Keggi*. And although the pollution exclusion's language may be less ambiguous as applied to the roofing fumes than as applied to total and fecal coliform bacteria, there is no basis on which Starr Surplus persuasively distinguishes

the rest of *Keggi*'s analysis from the facts of this case. The history of the pollution exclusion clause, the pertinent language, and the public policy are all the same. The fumes that are the alleged basis for the Delarosa action were not a pre-existing substance; they were produced by the standard installation of the roof itself and did not result from any efforts at environmental cleanup. This fact effectively takes the case out of "traditional environmental pollution-related claims." *See Nat'l Fire*, 162 F. Supp. 3d at 913 (concluding that "[t]he artificial creation of noxious fumes directly caused by standard plumbing installation 'takes the case out of any traditional environmental pollution-related claims'" (quoting *Saba*, 2014 WL 7176776 at *4 (concluding that a carbon monoxide leak was not a "traditional environmental pollution-related" claim because it was the product of a negligently installed water heater and not the result of environmental clean-up efforts))). Also, Starr Surplus has presented no evidence that any government entity required any clean-up efforts or otherwise became involved in any meaningful way as a result of Delarosa's injuries; thus, Arizona public policy prevents us from giving the pollution exclusion the interpretation proposed by Starr Surplus.

¶35 Further, the transaction as a whole—the insuring of a roofing business—calls into question the advisability of a broader application of the pollution exclusion than would arise in "traditional environmental pollution-related claims." In the present case, Starr Surplus' own underwriting activities made it fully aware of Star Roofing's work, and the risk inherent in the installation of a roof was contemplated by the Starr Policy. This was the very risk complained about in the Delarosa action, and the scope of interpretation requested by Starr Surplus would result in illusory coverage for the ordinary commercial business activities of the insured, a result not contemplated by either party to the insurance contract.

¶36 After considering the Arizona public policy limitations on pollution exclusions as comprehensively analyzed in *Keggi*, pollution exclusions are intended to cover traditional environmental pollution claims and not the bodily injuries allegedly suffered by Delarosa as a result of Star Roofing's alleged negligence in the installation of the commercial building's roof. The superior court correctly applied Arizona law in finding that the pollution exclusion in the Starr Policy only applies to a traditional pollution event and correctly applied the facts of this case to the analysis set forth in *Keggi*. Therefore, the superior court did not err in determining that the Starr Policy's pollution exclusion clause does not apply to bar coverage in this case and in granting summary judgment in favor of Star Roofing.

### C. Summary Judgment for Transwestern

**¶37** Starr Surplus also argues the superior court erred by granting Transwestern's motion for summary judgment on Transwestern's defenses of waiver, estoppel, and laches, in part because questions of material fact should preclude judgment as a matter of law.[4]

**¶38** We need not decide this argument, however. Although Starr Surplus correctly notes that Transwestern did not formally join Star Roofing's motion for summary judgment in the superior court on the coverage issue, our resolution of the application of the pollution exclusion in this appeal and issue preclusion render moot Starr Surplus' arguments regarding the grant of summary judgment in favor of Transwestern, especially given that the superior court did not expressly address Transwestern's request for sanctions for a declaration submitted in bad faith, *see* Ariz. R. Civ. P. 56(h), when it granted summary judgment in Transwestern's favor. *See, e.g., Circle K Corp. v. Indus. Comm'n,* 179 Ariz. 422, 425 (App. 1993) (explaining that "issue preclusion" precludes a party from using a second proceeding to relitigate an issue that has already been decided).

### II. The Superior Court's Awards of Attorneys' Fees and Costs

**¶39** Starr Surplus also challenges the superior court's awards of attorneys' fees and costs to Star Roofing and Transwestern.

### A. Standard of Review and Applicable Law

**¶40** Section 12–341.01(A) authorizes an award of attorneys' fees to the successful party in "any contested action arising out of a contract." "The application of A.R.S. § 12–341.01 is a question of statutory interpretation,

---

[4] As a premise to its argument, Starr Surplus notes the superior court never formally ruled on Transwestern's motion to strike a portion of the Allen affidavit, asserts the motion to strike was therefore denied by operation of law, and further asserts the court never ruled that the Allen affidavit was a sham declaration. However, the plain language of the court's minute entry granting summary judgment in favor of Transwestern ("[T]he Court finds [Starr Surplus'] attempt to overcome the evidence with a sham declaration falls short.") belies this assertion. Because Starr Surplus has not contested the superior court's evidentiary ruling that the Allen affidavit was a "sham affidavit," Starr Surplus has waived the issue of the affidavit on appeal. *See Jones v. Burk,* 164 Ariz. 595, 597 (App. 1990).

which we review *de novo*." *US Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 242 Ariz. 502, 507, ¶ 22 (App. 2017) (citation omitted).

**¶41** We review for an abuse of discretion, however, the amount of a fee award under § 12–341.01. *Assyia v. State Farm Mut. Auto. Ins. Co.*, 229 Ariz. 216, 222, ¶ 25 (App. 2012). "[T]he touchstone under § 12–341.01 is the reasonableness of the fees." *Id.* at ¶ 22. In our review, we consider whether "a judicial mind, in view of the law and circumstances, could have made the ruling without exceeding the bounds of reason." *Id.* at ¶ 25 (citing *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 571 (1985)). Although a trial court is required to set forth specific findings when awarding attorneys' fees under A.R.S. §§ 12-341.01(C) and 12-349, *see State v. Richey*, 160 Ariz. 564, 565 (1989), no such requirement exists for an award of fees under § 12-341.01(A), *see Associated Indem.*, 143 Ariz. at 571.

### B. Star Roofing's Application for Attorneys' Fees and Costs

**¶42** Starr Surplus argues the superior court erred in granting the full amount of Star Roofing's requested attorneys' fees and costs because the court failed to consider the reasonableness of those fees and costs.

**¶43** In support of its argument, Starr Surplus notes that it retained "one of the leading authorities in legal fee disputes," who opined that reasonable attorneys' fees for Star Roofing in this case would be $95,536.28, rather than the $211,966.80 in attorneys' fees and $6,757.47 in taxable costs requested and awarded by the court. Starr Surplus does not otherwise provide argument regarding any specific attorney billing rates or time entries, but simply posits that because the superior court specifically stated in its ruling that it had "considered all of the factors set forth in *Associated Indemnity Corp. v. Warner*, 143 Ariz. 567, 570 (1985), as well as the parties' arguments regarding same," the court must have failed to consider the reasonableness of the requested costs and attorneys' fees. Starr Surplus' premise is belied, however, by the fact that the superior court's minute entry states the court was awarding Star Roofing its "reasonable" attorneys' fees and taxable costs. Further, once a party establishes its entitlement to attorneys' fees and meets the minimum requirements in an application and affidavit, as Star Roofing did here, the burden shifts to the party opposing the award of attorneys' fees to demonstrate the impropriety or unreasonableness of the requested fees. *See State ex rel. Corbin v. Tocco*, 173 Ariz. 587, 594 (App. 1992). Given the extended litigation activities, Starr Surplus' generalized advocacy for a lesser award is unpersuasive, and we conclude the superior court did not abuse its discretion in finding that $211,966.80 constituted reasonable attorneys' fees in this case.

*C.  Transwestern's Application for Attorneys' Fees and Costs*

**¶44**　　　Starr Surplus also argues the superior court erred by not striking Transwestern's application for attorneys' fees and costs as untimely and by granting Transwestern's application.  We disagree.

**¶45**　　　As previously noted, after Transwestern filed its updated application for attorneys' fees and costs, Starr Surplus moved to strike the application.  Starr Surplus argued the application was untimely because it was not filed within twenty days of either the court's April 27 order granting Star Roofing's summary judgment motion or within twenty days of Transwestern's May 11 filing of a Notice of Lodging Proposed Form of Judgment.  *See* Ariz. R. Civ. P. 54(g)(3)(A)(i)-(ii).  In denying Starr Surplus' motion to strike and granting Transwestern's application for attorneys' fees and costs, the superior court ruled in pertinent part as follows:

> THE COURT FINDS the minimal delay of two Court days between 5/31/18 and 6/4/18 to have caused no prejudice to [Starr Surplus] and to be excusable and reasonable under the circumstances.  Accordingly, the Court exercises its discretion to permit the 6/4/18 filings and orders denying the Motion to Strike, good cause not shown.

> THE COURT FURTHER FINDS that Judge Blomo was originally presented with an application for award of attorney's fees and costs by Transwestern not long after he granted Transwestern's Motion for Summary Judgment on 1/12/17.  Judge Blomo found the filing "premature" and ordered that the issue "would abide the resolution of this matter."  Although this Court never obtained clarification of Judge Blomo's intent, the Court finds this matter is now resolved and therefore, the application for fees and costs is timely and proper to consider.

> The Court has considered all of the factors set forth in Associated Indemnity Corp. v. Warner, 143 Ariz. 567, 570 (1985), as well as the parties' arguments regarding same.

> THE COURT FINDS Defendant Transwestern is the prevailing party in this contested action arising out of contract, and is entitled to recover its reasonable attorney's fees under A.R.S. § 12-341.01 and its taxable costs under A.R.S. § 12-341.

Accordingly,

IT IS ORDERED awarding Defendant Transwestern its reasonable attorney's fees of one hundred forty-nine thousand eight hundred nineteen dollars and forty-eight cents ($149,819.48) and its taxable costs of three thousand eight hundred seventy-four dollars and twenty-two cents ($3,874.22).

(Internal record citations omitted.)

### 1. Denial of the Motion to Strike

**¶46**        Starr Surplus argues the superior court erred by not striking Transwestern's application for fees and costs as untimely under Rule 54(g)(3)(A)(ii), Ariz. R. Civ. P.

**¶47**        We review *de novo* the interpretation of a rule of civil procedure. *King v. Titsworth*, 221 Ariz. 597, 598, ¶ 8 (App. 2009). Rule 54(g)(3)(A) provides as follows:

(A) Adjudicating All Claims and Liabilities of Any Party. If a decision adjudicates all claims and liabilities of any party:

(i) If that party or another party moves for entry of judgment under Rule 54(b), or includes Rule 54(b) language in a proposed form of judgment, a motion for fees must be filed within 20 days after service of the motion or proposed form of judgment seeking Rule 54(b) treatment, or by such other date as the court may order.

(ii) If the court declines to enter judgment under Rule 54(b), or no party seeks entry of judgment under Rule 54(b), a motion for fees must be filed no later than 20 days after any decision is filed that adjudicates all remaining claims in the action, or 20 days after the action's dismissal, whichever occurs first.

**¶48**        Although the superior court (Judge Mahoney) did not expressly say so, it clearly applied subsection (i) when denying Starr Surplus' motion to strike. Starr Surplus argues that subsection (ii) should apply. We disagree. Rather than concluding a Rule 54(c) judgment was more appropriate and expressly declining to enter judgment under Rule 54(b) when Transwestern first filed its fee application and lodged its

proposed form of judgment in February 2017, Judge Blomo held the matter in abeyance, effectively deferring consideration of Transwestern's application under Rule 54(g)(3)(A)(i) and judgment under Rule 54(b) until conclusion of the action. *See* Ariz. R. Civ. P. 54(g) cmt. After the court ruled on the cross-motions for summary judgment filed by Star Roofing and Starr Surplus, both Star Roofing and Transwestern lodged separate proposed forms of judgment pursuant to Rule 54(b), placing Star Roofing and keeping Transwestern within the ambit of subsection (i) of Rule 54(g)(3)(A). The subsequent superior court judge, Judge Mahoney, appears to have resolved the question of Judge Blomo's intent in this manner, and we find no error in her ruling.

**¶49** Rule 54(g)(3)(A)(i) expressly gives the superior court discretion to extend the time for requesting attorneys' fees. Further, Starr Surplus fails to articulate, much less establish, any prejudice due to Transwestern's delay in filing its second, updated fee application. The superior court has discretion to award attorneys' fees and costs outside the twenty-day period set forth under Rule 54(g)(3)(A)(i) when the opposing party asserts no prejudice. *Cf. Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 479-80, ¶ 61 (App. 2010) (interpreting Rule 54(g)(2)); *Nat'l Broker Assocs., Inc. v. Marlyn Nutraceuticals, Inc.*, 211 Ariz. 210, 218, ¶ 38 (App. 2005) (concluding the court had discretion to consider an untimely attorneys' fee application).

*2. The Court's Grant of Transwestern's Fees Application*

**¶50** Starr Surplus raises several additional arguments in support of its position that the superior court erred in awarding attorneys' fees and costs to Transwestern. We find each of these arguments unavailing.

**¶51** First, Starr Surplus asserts Transwestern's counsel falsely represented that Transwestern had incurred the attorneys' fees and costs requested in the defense of the declaratory action,[5] and argues the court erred by permitting Transwestern to recover attorneys' fees and costs it had not paid or incurred a financial obligation to pay. The superior court retains discretion, however, to award attorneys' fees to a party whose fees have been covered by its insurer. *See Catalina Foothills Ass'n v. White*, 132 Ariz. 427, 428 (App. 1982) ("We do not hold that the trial court cannot properly

---

[5] This assertion by counsel for Starr Surplus that counsel for Transwestern made a false representation is both unavailing and troubling, as the record makes clear Transwestern has repeatedly acknowledged Zurich has defended and indemnified Transwestern.

consider such fact, i.e., that someone else may be obligated to bear the expense, but we find the weight to be accorded that fact to be wholly within the trial court's discretion." (citations omitted)); *see also Wilcox v. Waldman*, 154 Ariz. 532, 538 (App. 1987) ("[T]he fact that fees may ultimately be borne by third parties pursuant to an insurance or indemnity agreement does not prevent the successful party from meeting the requirements of A.R.S. § 12-341.01(B), entitling him to an award of attorney's fees against the unsuccessful party to the litigation." (citing *Catalina Foothills*)). Transwestern is entitled to recover its attorneys' fees in this declaratory judgment action, even if those fees are ultimately paid by Zurich.

**¶52** Second, Starr Surplus argues the superior court erred by failing to apply the voluntary payments doctrine to Transwestern's application to preclude recovery of attorneys' fees and costs on behalf of Zurich. The voluntary payments doctrine precludes an action by a third party who has voluntarily paid fees to recover from a party who has benefitted from such payment. *See Moody v. Lloyd's of London*, 61 Ariz. 534, 540 (1944) (citing *Merrill v. Gordon*, 15 Ariz. 521 (1914)). Even if Zurich was not contractually obligated to defend Transwestern as Starr Surplus suggests, Starr Surplus fails to demonstrate that this doctrine directly applies to the facts of this case. The superior court awarded attorneys' fees and costs to Transwestern, not Zurich, and we see no reason that the voluntary payments doctrine should preclude recovery of attorneys' fees by Transwestern.

**¶53** Third, Starr Surplus argues the superior court erred by failing to consider the reasonableness of Transwestern's requested attorneys' fees and taxable costs and awarding the full amount requested by Transwestern. Similar to its reasonableness argument regarding Star Roofing, Starr Surplus notes its expert opined that reasonable attorneys' fees for Transwestern in this case would be $67,463.23, rather than the $149,819.48 in attorneys' fees and $3,874.22 in taxable costs requested and granted by the court. Starr Surplus again does not provide argument regarding specific attorney billing rates or time entries or otherwise refute that the superior court's award of fees and costs is supported by the record. Instead, Starr Surplus argues the court must have failed to consider the reasonableness of the requested costs and attorneys' fees. However, as we noted with respect to Starr Surplus' challenge to Star Roofing's fees award, Starr Surplus' argument is belied by the fact that the superior court's minute entry states the court was awarding Star Roofing its "reasonable" attorneys' fees and taxable costs. Starr Surplus' generalized advocacy for a lesser award is again unpersuasive, and we conclude Starr Surplus has not demonstrated the court's award was unreasonable.

¶54 Fourth, Starr Surplus argues the superior court erred by granting attorneys' fees and costs incurred after the court ruled on Transwestern's motion for summary judgment. Because no final judgment with Rule 54(b) language was entered immediately after the court granted Transwestern's motion, the issue of fees and costs was not yet decided, and Transwestern had to continue to participate in the declaratory action because of an interest in the applicability of the Starr Policy's pollution exclusion. Thus, Transwestern was forced to incur additional fees pending final resolution of the declaratory action. Accordingly, we find no error in the superior court's award of attorneys' fees and taxable costs to Transwestern.

### III.     *Costs and Attorneys' Fees on Appeal*

¶55 Starr Surplus, Star Roofing, and Transwestern request costs and attorneys' fees on appeal pursuant to A.R.S. § 12-341.01. Star Roofing also requests attorneys' fees as sanctions against Starr Surplus pursuant to A.R.S. § 12-349 and Arizona Rule of Civil Appellate Procedure ("ARCAP") 25.

¶56 Starr Surplus is not the prevailing party on appeal, and its request is denied. Star Roofing and Transwestern are the prevailing parties on appeal, and in the exercise of our discretion, we award both Star Roofing and Transwestern taxable costs and attorneys' fees pursuant to A.R.S. § 12-341.01(A), in an amount to be determined upon compliance with ARCAP 21. We decline Star Roofing's request to award attorneys' fees as sanctions.

### CONCLUSION

¶57 The superior court's judgments in favor of Star Roofing and Transwestern are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA